**SALSBURY LABORATORIES, INC., Plaintiff,**

v.

**MERIEUX LABORATORIES, INC., et al., Defendants.**

Civ. A. No. 87–56–ATH.

United States District Court, M.D. Georgia, Athens Division.

Aug. 26, 1987.

---

Peter D. Murray and John P. White, Cooper, Dunham, Griffin & Moran, New York City, and Gary B. Blasingame and Andrew J. Hill, III, Athens, Ga., for plaintiff Salsbury Laboratories, Inc.

Kenneth L. Millwood and Joyce B. Klemmer, Smith, Gambrell and Russell, Atlanta, Ga., for defendant Merieux Laboratories, Inc.

FITZPATRICK, District Judge.

The court entertained Salsbury's motion for preliminary injunction during a three-day hearing held on August 6, 7, and 8, 1987. The central issue in the case concerns the misappropriation of alleged trade secrets by former Salsbury employees and Merieux Laboratories, Inc. At the hearing Salsbury produced sufficient evidence to establish a substantial likelihood of ultimately prevailing on the merits. The court finds, however, that Salsbury failed to show a threat of irreparable harm in the absence of the injunction, and therefore, the court denies Salsbury's motion for preliminary injunction. The court's findings of fact and conclusions of law in this action are set forth below.*

## I. FINDINGS OF FACT

This action was brought by Salsbury Laboratories, Inc. (Salsbury), a leading developer and producer of veterinary products in the United States. The individual defendants, Donald Hildebrand, Jack Berg, and Richard Leiting, are former employees of Salsbury. All three individual defendants are now employed by the corporate defendant, Merieux Laboratories, Inc. (Merieux). Merieux is a small laboratory in Athens, Georgia, set up as a wholly owned subsidiary of Rhone–Merieux Laboratories —France, an international developer and producer of veterinary products.

In 1966 Defendant Hildebrand joined Salsbury's subsidiary, Fromm Laboratories, Inc., as a Biologics Production Technician. In 1973 Salsbury transferred Hildebrand to its headquarters in Charles City, Iowa, and promoted him to Biologics Production Manager. In October, 1975, Hildebrand signed a broad trade secrecy agreement which prohibited the disclosure and use of Salsbury's trade secrets and confidential information.[1] By 1982 Hildebrand

---

* Editor's Note: This opinion has been edited for publication by the Court to preserve the parties' trade secrets. Double brackets ( [[ ]] ) have been inserted to indicate an omission.

1. A copy of Hildebrand's trade secrecy agreement, Exhibit 12 to the Affidavit of Dean E. Welch, Ph.D., filed in Support of Plaintiff's Motion for Preliminary Injunction, provides in pertinent part:

1. THAT I shall at no time use independently of my work for the Laboratories, nor at any time divulge to others information regarding any of the records, data, methods, processes, inventions, business plans, programs and/or practices acquired by me during my employment and held, owned and conceived on behalf of and as such identified by the Laboratories.

2. THAT if during any such employment I conceive or perfect a development, improvement, invention, design or discovery of any description whatsoever applicable to any chemical compound, product, working material, process, method, system, device, machine or design, whether of patentable or unpatentable nature, then or thereafter usable or actually used by the Laboratories, then every such

had become Director of Biological Operations for Salsbury.

After having been recruited by Rhone-Merieux, Hildebrand decided in late October, 1984, to leave Salsbury and become general manager of the Merieux plant in Athens. Hildebrand gave his notice of resignation to Salsbury on November 1 or 2, 1984, and was asked to leave Salsbury permanently that same day. He began his employment with Merieux two weeks later. Since joining Merieux, Hildebrand has been influential in overseeing the development of an inactivated vaccine which is very similar to a vaccine Hildebrand helped develop while at Salsbury. On April 16, 1987, the United States Department of Agriculture (USDA) gave public notice that it had granted Merieux a license to produce this inactivated vaccine under the trademark Gallimune.

Defendant Berg joined Salsbury as Biologics Production Supervisor in November, 1976. Upon entering employment with Salsbury, Berg signed a trade secrecy agreement which was very similar to the one signed by Hildebrand in 1975.[2] In January, 1983, Berg moved to Salsbury's subsidiary, Fromm Laboratories, Inc. Hildebrand contacted Berg in 1985 in an attempt to persuade Berg to come to work for Merieux. On January 3, 1986, Berg resigned from the employ of Fromm Laboratories, and shortly thereafter, took a position at Merieux.

Defendant Leiting joined Salsbury as Animal Testing Supervisor in 1980. On September 19, 1986, Leiting resigned from Salsbury and joined Merieux. Leiting's main responsibility at Salsbury was to care for the animals used by Salsbury in the testing of its products.[3]

While employed by Salsbury, defendants Hildebrand and Berg had primary responsibility for developing a bacterin vaccine that would prevent a major poultry disease caused by the bacterium Mycoplasma gallisepticum (MG). MG infects the respiratory and reproductive systems of chickens and has substantial adverse effects on egg production of commercial layer chickens. Hildebrand and Berg initially developed the vaccine for a single flock of infected chickens in Texas. After the initial autogenous vaccine proved successful, Salsbury continued researching and testing the vaccine in an attempt to produce a product that could be sold on the commercial market. On March 5, 1981, Salsbury submitted to the USDA a production outline of the vaccine[4] along with an application for a license to produce and market the vaccine. On February 12, 1982, the USDA issued a license to Salsbury authorizing the production and sale of the vaccine under the trademark MG–BAC. Salsbury was the sole producer of an inactivated MG vaccine commercially until Merieux entered the marked in April, 1987 with its competing vaccine, Gallimmune. As of June, 1987, Schering Plough was also producing an MG vaccine.[5]

In October of 1984, Salsbury improved its 1981 MG–BAC vaccine. The 1984 im-

---

development, improvement, invention, design or discovery shall automatically become the property of the Laboratories.

....

It should be pointed out that the validity of Salsbury's Patent Assignment And Trade Secrecy Agreement is not an issue before this court.

2. A copy of Berg's Patent Assignment And Trade Secrecy Agreement with Salsbury was filed as Exhibit 13 to the Affidavit of Dean E. Welch, Ph.D. The relevant language in Berg's Agreement is identical to that found in Hildebrand's Agreement.

3. Since the writing of this Order, the parties have agreed to dismiss Defendant Leiting without prejudice.

4. A production outline is a detailed step-by-step analysis of the method used in producing a vaccine. The outline includes, among other things, an explanation of testing procedures and chemical dosages used in making the vaccine.

5. According to Defendants' Brief in Opposition to Plaintiff's Motion for Preliminary Injunction, American Scientific Laboratories, a division of Schering Plough, was licensed by the USDA to produce and market an MG vaccine in 1987. No evidence was produced at the hearing, however, relating to the similarity of Schering's MG vaccine to the vaccines produced by Salsbury or Merieux, and no evidence was produced relating to the impact of the third vaccine on the market.

provements saved Salsbury approximately $100,000.00 per year in the production of the vaccine. In connection with the improvements, Salsbury submitted a new production outline informing the USDA of the changed vaccine formula. When Hildebrand left Salsbury's employ in November, 1984, he took some documents with him to Merieux including a copy of Salsbury's 1984 MG–BAC production outline. Although the evidence is somewhat unclear concerning the circumstances surrounding Hildebrand's taking of the documents from Salsbury, there is no dispute that Hildebrand had possession of the production outline when he came to Merieux. Hildebrand testified that he made a copy of this outline and destroyed the original.

One major area of disagreement in this action is the confidentiality of Salsbury's MG–BAC production outlines. Salsbury contends that the information in the production outlines, as well as the overall process used in developing its inactivated MG–BAC vaccine, constitute confidential information and trade secrets of Salsbury. Salsbury also alleges that the defendants used this information while developing a competing MG vaccine, Gallimune. Conversely, Merieux contends that the information needed to develop Gallimune came from common knowledge in the industry, and articles and information available in the public domain. Merieux asserts that any information available in the public domain cannot constitute trade secrets of Salsbury. Although Merieux asserts that Salsbury's production outlines should not be considered trade secrets of Salsbury, Merieux filed the production outline of Gallimune under seal in this action, and defendant Hildebrand testified that he considered Merieux' production outline to be strictly confidential and a trade secret of Merieux.

At the preliminary injunction hearing, Salsbury cited five specific areas in its production outline which it considered to be trade secrets. First, Salsbury alleged that the strain used to produce the MG vaccine was a trade secret. The Salsbury strain, which was identified at the hearing as the [[ ]] strain, [[ ]]. Although several strains

exist which could be used in making an MG vaccine, Merieux used the [[ ]]-strain when it began producing its MG vaccine in 1985.

Second, Salsbury asserted that the medium it used to develop the MG vaccine was a trade secret. The medium is comprised of those ingredients which are used to grow the organism. Salsbury changed its medium in 1984 to eliminate two ingredients that were unnecessary to the growth of the organism. Although Merieux is now using a different medium in the production of its MG vaccine, the medium Merieux used in the initial development of its vaccine was identical to the medium set forth in Salsbury's 1984 production outline.

Salsbury also contended that its method of concentrating liquid out of the medium was a trade secret. In 1981 Salsbury was using a method of concentration known as centrifugation. When Salsbury improved its MG vaccine in 1984, it began using a method of concentration known as [[ ]]. This new method allowed Salsbury to concentrate the liquid out of the medium more quickly than it could using the centrifugation method. At the time it began producing its MG vaccine, Merieux also used the [[ ]].

The fourth specific trade secret Salsbury raised at the hearing involved a procedure for sterilizing the mycoplasm [[ ]]. Salsbury was filter sterilizing the mycoplasm in 1981 but adopted the [[ ]] sterilization method in 1984. Defendant Berg worked on the [[ ]] method while at Salsbury and was largely responsible for introducing this sterilization method into the MG vaccine process at Salsbury. Merieux's 1987 production outline indicates that it also used the [[ ]] sterilization method while producing an inactivated MG vaccine.

The final specific area Salsbury alleged to be a trade secret involved the potency tests used to challenge the MG vaccine. These tests, required by the USDA, were used to insure the vaccine's effectiveness when given to infected birds. A comparison of Salsbury's 1984 production outline and Merieux's 1987 production outline indicates that the tests used by Merieux to test

its vaccine were very similar to those used by Salsbury.

The defendants argue that each one of the trade secrets cited by Salsbury at the hearing constitutes information that was known to those in the industry and was within the public domain. For example, the defendants produced evidence at the hearing showing that the medium used by Salsbury was a well-known medium for growing mycoplasm, and that the [[ ]] method was a common one for concentrating liquid from a medium. Moreover, the defendants showed at the hearing that the improvements Salsbury made to the medium in 1984 by deleting two ingredients had been well-documented in the literature for years. Although the court agrees that each individual step in the MG vaccine process may have been in the public domain, the court finds that the entire process used by Salsbury to produce its vaccine was not in the public domain. The court finds unpersuasive the portion of Hildebrand's testimony in which he stated that he believed Salsbury's method of producing the vaccine, as set forth in Salsbury's 1981 and 1984 production outlines, was not a trade secret of Salsbury.

## II. DISCUSSION

■ To obtain a preliminary injunction, the movant must establish the following: (1) a substantial likelihood of prevailing on the merits; (2) a threat of irreparable injury to the movant if the injunction is not granted; (3) proof that the threatened injury to the movant outweighs any threatened harm the injunction may cause the defendants; and (4) a showing that granting the injunction will not be adverse to the public interest. *Cunningham v. Adams*, 808 F.2d 815, 819 (11th Cir.1987); *W.E. Callaway v. Block*, 763 F.2d 1283, 1287 (11th Cir.1985); *Johnson v. United States Dept. of Agriculture*, 734 F.2d 774, 781 (11th Cir.1984). A preliminary injunction is an extraordinary remedy which the court should not grant "unless the movant 'clear-

ly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir.1983) (citing *Canal Authority v. Callaway*, 489 F.2d 567, 573 (5th Cir.1974)). This court finds that Salsbury has failed to carry its burden as to a showing of irreparable injury, and therefore, the court denies Salsbury's motion for preliminary injunction.[6]

### A. Substantial Likelihood of Prevailing on the Merits

During the three-day hearing, Salsbury claimed that the defendants misappropriated Salsbury's valuable trade secrets relating to the inactivated MG–BAC, and that the individual defendants breached their trade secrecy agreements with Salsbury. Salsbury alleged that taken as a whole, its process for producing the MG vaccine was a trade secret, and that Merieux misappropriated this trade secret by using Salsbury's MG vaccine production outline as a guideline for developing and producing a competing MG vaccine. Moreover, Salsbury claimed that defendant Hildebrand breached his trade secrecy agreement by taking Salsbury's production outline with him to Merieux, and that defendant Berg breached his agreement by using trade secret information he obtained while at Salsbury to help Merieux produce the competing vaccine.

To establish a substantial likelihood of prevailing on the merits, Salsbury must show that the process it used for developing and producing an inactivated MG vaccine was a trade secret of the company and not a matter of common knowledge within the industry. The Georgia Supreme Court has adopted the definition of trade secret that is set forth in 43 C.J.S. *Injunctions* § 148:

A trade secret, within the rules pertaining to the rights which can be protected by injunction, is a plan, *process*, tool, mechanism, or compound, known only to

---

**6.** The court recognizes that its findings of facts and conclusions of law at the preliminary injunction stage are not binding on the court in its determination on the merits. *University of Tex-*

*as v. Camenisch*, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *see also United States v. Jefferson County*, 720 F.2d 1511, 1520 n. 21 (11th Cir.1983).

its owner and those of his employees to whom it must be confided in order to apply it to the uses intended.

*Thomas v. Best Mfg. Corp.*, 234 Ga. 787, 218 S.E.2d 68, 71 (1975) (emphasis added); *Outside Carpets, Inc. v. Industrial Rug Co.*, 228 Ga. 263, 185 S.E.2d 65, 68 (1971). Although a trade secret does not require the uniqueness and novelty of a patent, "it must possess at least that modicum of originality which will separate it from everyday knowledge." *Cataphote Corp. v. Hudson*, 444 F.2d 1313, 1315 (5th Cir.1971).

In *Thomas, supra,* the Georgia Supreme Court upheld the trial court's finding that the formula and process used in manufacturing pre-dipped or coated gloves constituted a trade secret of the plaintiff. The Georgia Supreme Court held that the trial court was authorized in restraining a former employee from divulging information of the manufacturing process, and in restraining those to whom he may have divulged the information from using it. *Thomas,* 234 Ga. 787, 218 S.E.2d 68, 71. In addition, the Fifth Circuit Court of Appeals has held that the process required to manufacture a "Longsweep" swivel joint, used in the connection of oil well piping, is a trade secret of the manufacturer.[7] *FMC Corp. v. Varco Int'l Inc.*, 677 F.2d 500 (5th Cir.1982). The court of appeals noted that although other swivel joints were on the market, the precise method used in developing the "Longsweep" was not known in the industry, and thus, was a protectible trade secret of the plaintiffs. *Id.* at 503–04.

■ The court finds that the processes held to be trade secrets in *Thomas* and *FMC Corp.* are analogous to the process used by Salsbury in producing its MG vaccine. The court is persuaded by Salsbury's contention that its MG vaccine process as a whole, as set forth in its production outlines, rises to the level of a trade secret of the company, and that the defendants used

this trade secret to produce a competing MG vaccine. Although individual elements of the process may have been known, the method in which Salsbury processed and developed its vaccine was unique in the industry. Because Salsbury's process was a trade secret, the court finds that Salsbury has established a substantial likelihood of prevailing on the merits.

The court's finding is supported by the fact that since it began producing MG–BAC, Salsbury was the only company with an inactivated MG vaccine on the market for over five years. Moreover, Merieux, the second competitor to enter the MG vaccine market, did not begin developing an MG vaccine until Hildebrand, a key player in the development of Salsbury's MG vaccine, began his employment with Merieux.

The defendants cite at least two cases in support of their position that Salsbury's vaccine process was not a trade secret. These cases, however, are distinguishable from the action presently before this court. In *CVD, Inc., v. Raytheon Co.*, 769 F.2d 842 (1st Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986), the First Circuit Court of Appeals upheld a lower court jury finding that the manufacturing process of zinc selenide and zinc sulfide by chemical vapor deposition (cvd technology) was not a trade secret of Raytheon. The *CVD* case, however, differs from the case before this court in several ways. First, Raytheon published detailed information related to its cvd technology in periodic reports supplied to the government. After a brief period of time, all of these reports became available to the public. Conversely, Salsbury's reports to the USDA were stamped confidential, and at no time became available in the public domain. Second, the First Circuit noted Raytheon's wide public disclosure concerning its cvd technology including published papers, photographs, films, lectures and speeches. From the evidence produced at

7. Although the Fifth Circuit used the Restatement definition of trade secret in *FMC Corp.*, the court notes that for the purposes of the instant case, there is little practical difference between the Restatement definition and the C.J.S. definition adopted by the Georgia courts. The issue

in this case centers around the "process" of developing the MG vaccine, and both the C.J.S. and Restatement definitions include the word "process" within the scope of that information which can be protected as a trade secret.

the hearing, it seems the extent of Salsbury's public disclosure concerning its MG vaccine was a published article authored by Hildebrand which discussed only the methods of challenging the vaccine, not the process of developing the vaccine. Third, Raytheon failed to follow its own established procedures for the protection of trade secrets. From this fact the First Circuit held that there was sufficient evidence for the jury to conclude that Raytheon "did not have the intention to maintain the technology as a trade secret." *Id.* at 853. Salsbury, however, followed its standard procedures for protecting trade secrets, including marking the relevant documents "confidential," and consistently maintaining the posture that the MG vaccine process would be a trade secret of the company. Finally, it should be noted that although the jury found that Raytheon did not possess trade secrets in its cvd technology or in the processing of zinc sulfide, the district court judge in *CVD* indicated that he would have found that certain of Raytheon's manufacturing processes did constitute trade secrets. *Id.* at 854.

The defendants also cite a case from the Federal Circuit, *Litton Systems, Inc. v. Sundstrand Corp.,* 750 F.2d 952 (Fed.Cir. 1984). Litton filed a claim for patent infringement and misappropriation of trade secrets relating to ring laser gyroscopes (RLGs). The defendants in the *Litton* case, however, presented evidence that RLGs had been marketed for many years, that hundreds of RLG patents existed, and that the defendant had expended $12,000,-000 in its own development efforts. *Id.* at 957. Whereas the defendant in *Litton* became only one among a large number of RLG producers, Merieux became only the second producer of an inactivated MG vaccine following a period of five years when Salsbury had been the sole producer of such a vaccine. Because of the wide public disclosure of the alleged trade secrets in *CVD, Inc.* and *Litton,* these cases do not support Merieux' argument that Salsbury's vaccine process was not a trade secret of the company.

### B. *Irreparable Injury*

Salsbury claims that unless Merieux is enjoined from selling the competing MG vaccine, Salsbury will lose large profits, and Salsbury's image, reputation, and goodwill among its customers will be damaged. Salsbury claims that without the injunction the trade secrets used by the defendants may be disclosed to other competitors. Salsbury further claims that lost sales to Merieux may result in an inability to recover investments in the research and development efforts which led to the MG–BAC vaccine.

 An injury is "irreparable" only if it cannot be compensated by monetary damages. *Cunningham,* 808 F.2d at 821; *see also Mountain Medical Equip., Inc. v. Healthdyne, Inc.,* 582 F.Supp. 846, 848 (D.Colo.1984) (irreparable injury "requires a substantial threat of harm to the movant that cannot be compensated by money"). Discussing the concept of irreparable injury, the Supreme Court has stated:

> The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974) (emphasis in original). Moreover, injury which can be measured in dollar amounts does not constitute irreparable injury for purposes of a preliminary injunction. *Crane v. Mathews,* 417 F.Supp. 532 (N.D.Ga.1976); *see also Consol. Brands, Inc. v. Mondi,* 638 F.Supp. 152 (E.D.N.Y.1986) (actual loss of business is a quantifiable injury and not the proper subject of preliminary injunction).

 Salsbury's injuries in this case are of the type that can be properly compensated by a monetary award. If Salsbury is successful in a subsequent trial on the merits, the court can award monetary damages to compensate for lost sales and the misap-

propriation of trade secrets by former Salsbury employees. Although Salsbury also complains of injury to its image and reputation among its customers, at least one court of appeals has held that loss of "goodwill and 'untold' customers" is speculative and does not constitute irreparable harm. *Goldie's Bookstore, Inc. v. Superior Court,* 739 F.2d 466, 472 (9th Cir.1984) (citing Wright and Miller, 11 *Federal Practice and Procedure* § 2948 at 436 (1973)). In addition, it seems highly unlikely that Merieux will disclose Salsbury's trade secrets to other competitors in light of the fact that Merieux filed its own documents relating to the MG vaccine under seal with the court, and seems intent on keeping its new vaccine formula confidential.

For these reasons, the court finds that Salsbury has failed to show a substantial threat of irreparable injury if the injunction is not granted.[8]

### C. Balancing the Threatened Injuries

Salsbury contends that Merieux is reaping the benefits of using Salsbury's trade secrets concerning the MG vaccine without having made an investment of time, money, and man-hours. Salsbury claims that although it will be irreparably harmed without the injunction, Merieux has little at stake in the production of the competing MG vaccine and will not be seriously harmed by issuance of the injunction.

■ As the Eleventh Circuit has noted, "[a] decision as to the propriety of a preliminary injunction turns on the balance of harm and the ability to compensate an injured party." *United States v. Lambert,* 695 F.2d 536, 540 (11th Cir.1983). The evidence produced at the hearing showed that Merieux would be forced to lay off four employees if the injunction issued. In addi-

tion, Hildebrand testified that twenty-four months elapsed from the time Merieux began developing its MG vaccine until the time it received a license to sell the vaccine. From this evidence it would seem that Merieux does have some stake in its MG vaccine. Although it appears Salsbury has suffered monetary loss from the alleged misappropriation of its trade secrets, the court cannot find that this injury outweighs any damage the injunction may cause Merieux.

### D. Public Interest

■ The court recognizes the competing public policy arguments in this case. Salsbury claims that the public interest is furthered by protecting valuable trade secrets from misappropriation. Merieux argues that issuing the injunction would impede competition and might prevent prices in the industry from declining. The court takes note of the fact that at the hearing, both parties stipulated that as of June, 1987, Schering Plough became the third company to enter the MG vaccine market. Moreover, Salsbury produced no evidence showing that Schering Plough misappropriated Salsbury's trade secrets in developing a new MG vaccine. Because legitimate competition is now present in the market, the court feels that it would be inappropriate to restrain Merieux from selling its MG vaccine. As noted earlier, the proper remedy if any in this case is in monetary damages, not in an injunction that would stifle business competition. *But see Ecolaire, Inc. v. Crissman,* 542 F.Supp. 196, 211 (E.D.Pa. 1982) (public interest favoring competition "does not mean that defendants are entitled to free access to plaintiff's trade secrets, nor does this mean that defendants may compete unfairly"). Therefore, the court finds that public policy weighs

---

**8.** The Eleventh Circuit has stated that the harm to be considered by the district court in ruling on a preliminary injunction motion "is necessarily confined to that which might occur in the interval between ruling on the preliminary injunction and trial on the merits." *Lambert,* 695 F.2d at 540. In *Lambert* the district court denied the preliminary injunction because the plaintiff had failed to establish irreparable injury. The Eleventh Circuit noted that "[t]he dis-

trict court might well have come to a different conclusion had it known that there would be over a year's delay before the case would reach final hearing." *Id.* This court does not expect a lengthy delay before a trial on the merits in the instant case. The court recognizes that Salsbury's trial on the merits is scheduled for late September, and that this fact weighs against a finding of irreparable injury in the instant case.

against granting an injunction in Salsbury's favor.

For the foregoing reasons, this court denies Salsbury's motion for preliminary injunction.

SO ORDERED.