### DIAMOND POWER INTERNATIONAL, INC., Plaintiff,

v.

### CLYDE BERGEMANN, INC., Defendant.

### No. CIV.A. 1:04CV1708RWS.

United States District Court, N.D. Georgia, Atlanta Division.

May 17, 2005.

---

Allison V. Richardson, Brett E. Coburn, F. Skip Sugarman, Warren R. Hall, Jr., Alston & Bird, Atlanta, GA, for Plaintiff.

Jeffrey D. Mokotoff, Leanne C. Mehrman, Ford & Harrison, Atlanta, GA, for Defendant.

## *ORDER*

STORY, District Judge.

Now before the Court for consideration is Plaintiff's Motion for Preliminary Injunction [15–1], Defendant's Motion for Leave to file its supplemental brief [82–1], Defendant's Request for Judgment in its Favor [82–2], Defendant's Motion for Attorney's Fees [82–3], and Plaintiff's Motion to Strike. After considering the entire record, the evidence and testimony presented at the hearing, and the arguments of the parties, the Court enters the following Order.

### Procedural History

Plaintiff Diamond Power International, Inc. ("Diamond Power") is in the business of manufacturing and selling industrial boiler cleaning systems. Defendant Clyde Bergemann, Inc. ("Bergemann") is engaged in a substantially similar business

and is a direct and primary competitor of Diamond Power. This case arose out of Bergemann's employment of Wayne Davidson, a former employee of Diamond Power.

After Davidson left Diamond Power and began employment with Bergemann, Diamond Power examined Davidson's company-issued laptop. Diamond Power found what it believed was evidence that Davidson had transferred proprietary information from the laptop to an external drive. On January 13, 2004, Diamond Power filed suit against Davidson asserting claims for violation of the Georgia Trade Secrets Act, breach of contract, breach of fiduciary duty and loyalty, violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and misappropriation and conversion of property seeking injunctive relief and damages. *See Diamond Power International, Inc. v. Wayne Davidson*, civil action no. 1:04–CV–91–RWS. On January 14, 2004, the Court granted Diamond Power's Motion for *ex parte* temporary restraining order to permit Diamond Power to obtain duplicate images of Davidson's computer hard drives and equipment. Subsequently the parties entered into a consent restraining order in that case.

After reviewing the images made from Davidson's computer, on June 14, 2004, Diamond Power initiated the instant lawsuit against Bergemann asserting claims for violations of the Georgia Trade Secrets Act, violation of the computer fraud and abuse act, 18 U.S.C. § 1030, misappropriation and conversion of property, tortious interference with business relations, unjust enrichment and tortious interference with contract. On June 17, 2004 the Court entered a temporary restraining order [3] enjoining Bergemann from, *inter alia*, using or disclosing any documents that originated from Diamond Power and from spoliating evidence. The TRO also permitted Diamond Power to make images of the computer and servers of Bergemann.

Both the suit against Davidson (the "Davidson action") and the suit against Bergemann (the "Bergemann action") are now pending before the Court. On July 8, 2004, the Court entered an Order that consolidated discovery in both cases and established deadlines based on the Bergemann action. On October 20, 2004, Diamond Power filed a motion seeking a preliminary injunction. The parties came before the Court on December 15, 2004 for a hearing. The parties requested additional time to conduct discovery, which the Court granted. The Court held an evidentiary hearing on Diamond Power's Motion for Preliminary Injunction on March 23, 2005. The sole product for which Diamond Power seeks injunctive relief is its PowerTrain product.

**Factual Background**

Diamond Power and Bergemann are competitors engaged in the sale of sootblower cleaning systems. The product at issue is a product developed by Diamond Power, the PowerTrain carriage. The PowerTrain carriage is described as a "dry hub" carriage, because it does not require the addition of oil or grease as a part of its regular maintenance. It was developed by Diamond Power as an alternative to prior carriages to reduce maintenance requirements and to eliminate the housekeeping problem that arose when the lubricants leaked.

Diamond Power conceived of a dry hub carriage and began conceptual design review in 1995. The engineering group at Diamond Power extensively researched different components that could be used in

the development of the PowerTrain. During this process, the research and development results were not generally shared outside of the engineering group. By 2001, lead test units of the PowerTrain carriage had gone out for testing. In 2002, Diamond Power began a process called "Design Review." The purpose of the Design Review was to get feedback from a broader audience around the company about the new product before it was released for sale. As a result of the Design Review process, Diamond Power continued sending out lead test units, continued testing on coatings, and continued testing coatings on gears. PowerTrain was released for full sale in mid–2003. Diamond Power describes the PowerTrain as a popular product that has experienced "brisk" sales. Over one-thousand PowerTrain carriages have been sold since they were released for sale in 2003.

In order to maintain the confidentiality of certain information, Diamond Power employs various measures. First, the engineering department only shares limited information with the sales department regarding the specifics of the PowerTrain. One example is a document produced by Diamond Power called a "New Product Engineering Release" ("NPER"). The NPER is a document created by the engineering department for the sales and marketing department to share information about a product including its applications and top selling points. It is created with the understanding the sales people will share certain information with customers and therefore omits certain information. The NPER regarding PowerTrain contains language stating that it is for internal use only. Specifically, Robert Honaker, the Diamond Power employee who completed the initial draft of the NPER understood that he should not include certain information in the NPER including the gear coating manufacturer and its process.

Even so, the NPER contains fairly detailed information about the PowerTrain carriage including: reference to the high-temperature self-lubricating bearings; reference to a special coated hardened bevel gear set and the fact that a break-in paste is used; and identification of the grease used in the gear chamber. Also, the PowerTrain NPER notes the specific components which comprise the changes in the PowerTrain from the standard Series One carriage.

Diamond Power also requires that customers refrain from opening the PowerTrain carriage assembly. If a customer opens the carriage assembly they risk voiding the product warranty. Additionally, the terms and conditions of sale provide that information transmitted between Diamond Power and their customers are the property of Diamond Power and that they should not be used for any purpose detrimental to Diamond Power. Diamond Power has never, however, sought to enforce this provision against a customer. Moreover, Diamond Power does not retain any control over a customer's use or disposal of a PowerTrain carriage once it has been purchased.

One example of a document provided by Diamond Power to customers is the Parts Identification form ("P.I.form"). The P.I. form consists of three pages. The first page shows a drawing of a carriage. The second page is a drawing of the carriage so that each part is identifiable and the third page provides corresponding detail and part numbers. The P.I. form was created to allow customers to purchase replacement parts. The P.I. form for PowerTrain does not give a part number for the bevel gears or the bearing. The P.I. form for

PowerTrain was initially distributed with PowerTrain carriages as they were sold, from 2003 through December 2004. The P.I. form does not give the names of specific greases or lubricants used in the PowerTrain. Diamond Power ceased sending out the P.I. form with the PowerTrain carriages sold in order to correct customers' mistaken impression that they could order individual parts of the PowerTrain. Diamond Power does not require that customers return their carriages to Diamond Power for the purpose of being rebuilt or for disposal. Diamond Power is aware that in the past customers have sent Diamond Power carriages to Bergemann in order to be rebuilt.

Finally, another document provided by Diamond Power that is relevant to the PowerTrain carriage is a Material Safety Data Sheet ("MSDS"). The MSDS provides information regarding a particular lubricant including its properties and dangers associated with it. A customer may request a MSDS in order to be in compliance with certain regulations.

Prior to October 2003, Wayne Davidson was the Manager of U.S. Service Center Operations for Diamond Power. As a part of his position with Diamond Power, Davidson was a part of the PowerTrain Design Review process that took place in 2002. At the time he became involved with the Design Review of the PowerTrain, it was already being tested in the field. Davidson was not involved in the research and development that led to the production of the PowerTrain.

Around October 2003, Bergemann formally hired Davidson as Manager of its Rebuild Activities. Davidson formally resigned from Diamond Power on October 31, 2003 and began working for Bergemann on November 3, 2003. On November 4, 2003, Davidson participated in a meeting at Bergemann regarding the rebuild of a particular Bergemann Pre–Series One Carriage. At the meeting, the discussion included future plans by Bergemann to develop an alternative to Diamond Power's PowerTrain. Around that time, Steve Weinkle, who at the time of the November 2003 meeting was the Supply Chain Manager, brought a particular bearing to Davidson. Davidson examined the bearing and confirmed that he believed that it looked like the same bearing used by Diamond Power in the PowerTrain carriage. In an email dated January 30, 2004 to other employees of Bergemann, Davidson made the following disclosures: that Diamond Power hardens the gears and coats them with [[ ]]; that they coat the bevel gears with [[ ]] during the assembly process and that the [[ ]] grease is used in the PowerTrain.[1]

Hans Schwade, the President of Clyde Bergemann, Inc., first heard of the PowerTrain in February 2003. Bergemann learned from customers that Diamond Power was using hardened gears and a break-in paste. At that time, Bergemann had done no testing or research and development on a dry hub carriage. In October 2003, Schwade learned from his employee, Larry Barr that another employee who worked with Clyde Bergemann Scandinavia had information on the bearing being used in the PowerTrain. Schwade emailed the employee. The employee's supervisor,

---

**1.** The Court uses "[[ ]]" to identify specific information omitted out of deference to the parties' assertions that certain information constitutes a trade secret or confidential information. Accordingly, this should not be read to reflect any indication of the Court's conclusion regarding whether this information is actually a trade secret and/or confidential information.

Pertti Eckdahl, received the email and responded. Eckdahl contacted the bearing manufacturer who confirmed that they were the supplier for this particular type of bearing, that it had been in production for five to six years, and that they had recently been supplying Diamond Power with significant amounts of the bearing. Wayne Davidson retired from his employment with Bergemann in December 2004.

### Discussion

As a preliminary matter, the Court addresses Plaintiff's Motion to Strike [91]. On April 6, 2005, Defendant filed its post-hearing brief with the Court and included as an exhibit a declaration by Joey Payne which purports to establish that Bergemann received a PowerTrain carriage that was sent to it by a customer. Plaintiff has moved to strike the declaration as untimely. The Court finds that the declaration is untimely. Accordingly, Plaintiff's Motion to Strike is hereby **GRANTED**. The Court has not considered this declaration in rendering the decision in the present motion.[2]

■ In its Motion for Preliminary Injunction, Diamond Power alleges that Bergemann has misappropriated its trade secrets regarding the PowerTrain Carriage. Diamond Power seeks to enjoin Bergemann from marketing or selling any dry hub carriage for a period of four years or until they can show that they have developed their own in a "clean room" environment. Additionally, Diamond Power seeks the appointment of a special master to monitor Bergemann's activities to ensure compliance with the injunction. Bergemann responds that Diamond Power has not established the existence of a trade secret because the PowerTrain carriage has been sold to the public and was not subject to reasonable efforts to maintain secrecy.

■ "The purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *United States v. Alabama*, 791 F.2d 1450, 1458 (11th Cir.1986). In order to be entitled to a preliminary injunction, the moving party must demonstrate (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury to the movant outweighs the damage to the opposing party; and (4) granting the injunction would not be adverse to the public interest. *Four Seasons Hotels & Resorts v. Consorcio Barr*, 320 F.3d 1205, 1210 (11th Cir.2003); *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 148 F.Supp.2d 1326, 1334 (S.D.Fla.2001). "The preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson County*, 720 F.2d 1511, 1518 (11th Cir.1983) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)). The movant must carry the burden of persuasion as to all four requirements. *Id.* A district court's findings made on an application for preliminary injunction are not controlling at a later hearing. *See Jefferson County*, 720 F.2d at 1519 n. 21. The Court finds that Plaintiff has failed to carry its burden as to each requirement and is therefore not entitled to preliminary injunctive relief.

### I. Likelihood of Success on the Merits

■ Diamond Power contends that Bergemann has misappropriated its trade se-

---

**2.** That the Court is not considering the declaration for purposes of the Motion for Prelimi-
nary Injunction does not preclude use of the document in subsequent litigation.

crets with regard to PowerTrain. The Georgia Trade Secrets Act, O.C.G.A. § 10-7-761, sets forth the definition of a trade secret.

> (4) "Trade secret" means information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information:
>
> (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

A claim for misappropriation of a trade secret under Georgia law requires that a plaintiff show (1) that it had a trade secret, and (2) that it was misappropriated by the opposing party. *See Penalty Kick Mgmt. v. Coca Cola Co.*, 318 F.3d 1284, 1290–91 (11th Cir.2003). Defendant Bergemann argues that Diamond Power has failed to identify with specificity what it claims are its trade secrets. Further, Defendant contends that any of the alleged disclosures made by Davidson cannot constitute a Diamond Power trade secret because the information is publicly available because over one-thousand PowerTrains have been publicly sold. *See Roboserve, Ltd. v. Tom's Foods, Inc.*, 940 F.2d 1441, 1454 (11th Cir.1991) (holding that Georgia's law of trade secrets cannot protect any unpat-ented part or combination of parts after it was sold to the public, because the public sale destroyed any reasonable expectation of secrecy).

The Court agrees that Plaintiff has failed to identify with any specificity exactly what it contends constitutes a trade secret. *Compare Penalty Kick*, 318 F.3d at 1289 (parties agreed on chart which was adopted by the district court identifying eighteen specific elements claimed to be trade secrets). Though Plaintiff has vehemently argued that its trade secrets are entitled to protection, it has not identified what it contends are its trade secrets sufficiently for the Court to determine whether they are readily ascertainable by proper means or if they have been subject to efforts that are reasonable under the circumstances to maintain secrecy. In its response to interrogatories, Plaintiff essentially claimed that everything incorporated into the PowerTrain was a secret including all parts, components, lubricants, gears, treatments and structures. In order to narrow the focus on particular parts of the PowerTrain, the Court refers to the PowerTrain NPER and to the disclosures made by Wayne Davidson. The NPER has been the subject of much discussion and dispute among the parties. Plaintiff has agreed, however, that none of the information in the NPER constitutes a trade secret. Moreover, the parties have not disputed the nature of the disclosures made by Davidson to Bergemann. Therefore, as a matter of deduction, the Court may refer to the NPER and Davidson's disclosures to aid in determining what the claimed trade secrets may be.

The Court concludes that the following components of the PowerTrain should be examined for trade secret status: (1) the bearing; (2) the bevel gear coating; and,

(3) the bevel gear break-in paste.[3] First, the NPER states that the "bearings, bevel gears, casting and drive shaft seal" are the only features that distinguish the Power-Train from the Series One carriage. The NPER goes on to describe "critical components" of the PowerTrain. While it discusses the bearing and notes that it is specifically manufactured for Diamond Power, the NPER does not identify the manufacturer of the bearing, what it is made of or its specifications. The NPER describes the bevel gears and describes the fact that they are coated and notes that a grease is applied to them at break-in. It does not give the name of the coating or of the paste.

The Court finds that Plaintiffs are not likely to prevail on their assertion that these components constitute trade secrets. In order for Plaintiff to recover for violation of the Trade Secrets Act, under O.C.G.A. § 10–1–761(4)(b), Plaintiff must show that it took reasonable efforts under the circumstances to keep its information secret. First, the record indicates that the bearing was in fact, stamped with the name of the bearing manufacturer. Although Plaintiff requested that the bearing manufacturer not stamp the bearing, the manufacturer insisted on placing the iden-tifying information on the bearing. The bearing manufacturer did agree to give the bearing a specific part numberbut Plaintiff did not demonstrate any evidence of any agreement whatsoever that would prohibit disclosure or sale of the bearing to others. Consequently, Defendant was able to receive a sample of the bearing from a customer and simply call the manufacturer in order to find out the specifications of the bearing and confirm that they were being sold to Diamond Power.

■ The identity of the coating and break-in paste was conveyed to customers by Diamond Power by providing them with requested MSDS. Diamond Power agreed that if a customer requested an MSDS, then one would be provided to them. In fact, Davidson, while employed with Diamond Power, did in fact send such an MSDS to a customer.[4]

Additionally, Plaintiff is well aware that its customers regularly send Diamond Power carriages to Bergemann to be serviced and to be rebuilt. Even so, aside from the general language in the terms and conditions of sale or rebuild and the warranty requirement, Plaintiff made no real effort to maintain the confidentiality of the components at issue. *Compare*

---

3. Notably, the Court has not included certain items that previously have been the subject of dispute because those items are identified or described in the NPER including: the name of the grease used in the PowerTrain, and the fact that the bevel gears are hardened.

4. Insofar as Plaintiff contends that Davidson may not have been authorized to do so, Plaintiff has not identified any written policy regarding the MSDS or any other written confidentiality policy other than a vague and general understanding that the engineering department would not give all details to the sales department about the PowerTrain. While this may have been the general under-standing, it is unclear what the parameters of this unwritten policy were and which items were considered confidential in nature.

Additionally, Plaintiff argues that it is inconsequential that customers knew of the information. However, the customers had a great economic incentive to know how the PowerTrain worked. First of all, customers would benefit from competition if Bergemann offered a competing product. Additionally, the record reflects that some customers desired to service their own equipment so that they would not have to rely on Diamond Power.

*CMAX/Cleveland, Inc. v. UCR, Inc.*, 804 F.Supp. 337, 357–58 (M.D.Ga.1992) (recognizing considerable efforts to maintain secrecy where party prohibited disclosure, reproduction, assignment, included proprietary notices, required employees to sign confidentiality agreements, and required others to sign non-disclosure agreements), *with Smith v. Mid–State Nurses, Inc.*, 261 Ga. 208, 403 S.E.2d 789, 790 (1991) (finding no trade secret protection of customer lists where sole evidence of efforts to maintain secrecy was oral instruction to maintain confidentiality of other written forms). For instance, Plaintiff has never sought to enforce the terms and conditions against a customer. Nor does Plaintiff require that used carriages be returned to it.

■ However, the fact that the components that make up the PowerTrain are commercially available does not prevent Plaintiff from potentially establishing trade secret protection for a proprietary process or method of manufacturing the PowerTrain. *See Tronitec, Inc. v. Shealy*, 249 Ga.App. 442, 547 S.E.2d 749, 756 (2001) (company's data, programs, devices and methods of repairing circuit boards may constitute trade secret); *Essex Group, Inc. v. Southwire Co.*, 269 Ga. 553, 501 S.E.2d 501, 503 (1998) (logistical process was a trade secret); *Thomas v. Best Manf. Corp.*, 234 Ga. 787, 218 S.E.2d 68, 71 (1975) (formula, process and machinery configuration for manufacture of coated gloves constitutes a trade secret). In this case, even if Plaintiff could establish that it used a proprietary process in creating the PowerTrain, Plaintiff has not established that any of this information was misappropriated. Here, Plaintiff has not presented any evidence that Wayne Davidson had any knowledge as to the processes or pro-

cedures developed in creating the PowerTrain. Davidson became involved with the PowerTrain during the Design Review Process after it was already being tested. He is not an engineer and was not involved in the original design, testing, or research and development that led to the creation of the PowerTrain. Furthermore, the evidence indicates that while he may have been privy to some discussion of the results of certain testing, he did not retain the detailed information regarding the processes that went into the creation of the components. For instance, while he conveyed the fact that the bevel gears were hardened (a fact that Diamond Power itself included in the NPER and disclosed to customers), he did not recall the way they had been hardened or the exact hardness. The Court finds that Plaintiff has not established a likelihood of success on the merits of its claim that Defendant misappropriated its trade secrets.

## II. Irreparable Injury

■ Equally detrimental to Plaintiff's motion for a preliminary injunction is the fact that Plaintiff has wholly failed to establish that it will be irreparably harmed if the Court does not grant the requested injunction. Plaintiff's argument is that Defendant misappropriated its trade secrets to create a competing product much faster than it could have on its own. A similar argument was made by the Plaintiff in *Salsbury Laboratories, Inc. v. Merieux Laboratories, Inc.*, 735 F.Supp. 1537, 1543 (M.D.Ga.1987). In that case, the plaintiff manufacturer of certain vaccines sued and alleged that the defendant had misappropriated its trade secrets which it used to create a competing vaccine. The plaintiff sought a preliminary injunction to prohibit the defendant from selling a competing product. *Id.* The plaintiff argued

that unless the court enjoined the defendant from selling the competing vaccine, it would lose large profits and that its image, reputation and·goodwill among its customers would be damaged. *Id.* The district court rejected the plaintiff's argument and concluded that because the plaintiff could be compensated for lost sales through monetary damages, injunctive relief was not appropriate. *Id.*

 Likewise, in this case, the Court finds that Plaintiff will not suffer irreparable injury absent an injunction. "[A] mere threatened monetary injury, which can be addressed in damages, is insufficient to establish the irreparable injury essential to the issuance of a preliminary injunction." *Corbin v. Corbin,* 429 F.Supp. 276, 282 (N.D.Ga.1977); *see Lewis v. S.S. Baune,* 534 F.2d 1115, 1124 (5th Cir.1976) (discussing interplay between adequacy of remedy at law and irreparable injury). If Plaintiff is ultimately successful on the merits of its claim, it may receive monetary damages for the lost sales it contends it has suffered as a consequence of Defendant's misappropriation of its trade secrets.

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Jefferson County,* 720 F.2d at 1520 (quoting *Sampson v. Murray,* 415 U.S. 61, 90,

94 S.Ct. 937, 39 L.Ed.2d 166 (1974)). Because Plaintiff has not established that it will suffer irreparable injury if the injunction is not granted, the Court finds that a preliminary injunction is not proper.[5]

### Conclusion

Accordingly, Plaintiff's Motion for Preliminary Injunction [15–1] is hereby **DENIED.** Defendant's Motion for Leave to file its supplemental brief [82–1] is **GRANTED** nunc pro tunc. Defendant's Request for Judgment in its Favor [82–2] is **DENIED.** Defendant's Motion for Attorney's Fees [82–3] is **DENIED,** and Plaintiff's Motion to Strike [91] is **GRANTED.**

---

5. Having concluded that Plaintiffs have not established two requirements for issuance of a preliminary injunction, the Court does not address the remaining elements concerning balancing the harms and the public interest.