S98A0505. ESSEX GROUP, INC. et al. v. SOUTHWIRE COMPANY.
(501 SE2d 501)

HUNSTEIN, Justice.

Southwire Company brought suit against its former employee, Richard McMichael, and his new employer, Essex Group, Inc., to enjoin McMichael from disclosing to Essex any Southwire trade secrets, particularly, trade secrets involving Southwire's logistics system. The matter was presented to a special master whose report and recommendations were adopted by the superior court. The court ruled that Southwire's logistics system as a whole constitutes a trade secret under OCGA § 10-1-761 (4) and issued an injunction prohibiting McMichael from working in Essex's logistics department for five years or sooner if Essex independently develops its own logistics system. The court also entered an order appointing an impartial verifier to confirm Essex's compliance with the terms of the injunction and to determine when Essex had independently developed its own system.

Southwire and Essex are direct competitors in the cable and wire industry. Southwire's logistics system is a warehouse organizational system with components extending from architectural layout features to customized equipment and modified computer software. Southwire's logistics system was primarily designed over a three-year period, with a development cost exceeding $2 million, by a project team headed by McMichael. In addition to self-testing and a trial-and-error learning process, development of Southwire's logistics system also included modifications based on observation of logistics systems in other industries and the adaptation of commercially-available components. The special master found that the logistics

system has resulted in substantial efficiencies to Southwire, with annual savings of $1.2 million; the special master further found that because Southwire and its competitors, such as Essex, produce basically identical goods for sale, the marketing advantage gained by the important efficiencies that have resulted from the new logistics system has proved especially valuable for Southwire.

1. Essex contends the superior court erred by holding that Southwire's logistics system is a trade secret. Under the Georgia Trade Secrets Act of 1990, OCGA § 10-1-760 et seq., "trade secret" is defined as

> information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information:
>
> (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

OCGA § 10-1-761 (4). The Act supersedes previous Georgia law on trade secrets, OCGA § 10-1-767 (a), although prior law consistent with the Act remains viable precedent. *Avnet, Inc. v. Wyle Labs.,* 263 Ga. 615 (437 SE2d 302) (1993).

(a) Essex contends Southwire's logistics system cannot be a trade secret because it is composed primarily of matters within the public domain. We disagree. "The fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements." Restatement of the Law 3d, Unfair Competition (1995), § 39 (f), p. 432. Hence, courts have recognized that

> "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which in unique combination, affords a competitive advantage and is a protectible secret."

*Water Svcs. v. Tesco Chemicals,* 410 F2d 163, 173 (5th Cir. 1969).

A unique process which is not known in the industry "can be

a trade secret even if all of its component steps are commonly known." [Cit.] In other words, "a trade secret process may be established even if known components are assembled and known techniques are combined to produce a useful process which is not known in the industry." [Cit.]

*Salsbury Labs. v. Merieux Labs.*, 735 FSupp. 1555, 1569 (13) (M. D. Ga. 1989), aff'd 908 F2d 706 (III) (A) (11th Cir. 1990).

[A] trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful and valuable integration of the public domain elements and the trade secret gave the [trade secret owner] a competitive advantage which is protected from misappropriation.

*Rivendell Forest Prods. v. Georgia-Pacific Corp.*, 28 F3d 1042, 1046 (10th Cir. 1994). We find this legal precedent persuasive and consistent with the Georgia Trade Secrets Act.

In this case, the special master noted that notwithstanding the fact that most, if not all, of the computer hardware components and warehouse equipment in Southwire's logistics system are commercially available, Southwire had established that "its selection and arrangement of components and equipment are unique to the Southwire logistics system," and found that the entirety of Southwire's logistics system[1] was a "trade secret" under OCGA § 10-1-761 (4) because it constituted a device, method, technique or process "which is not commonly known by or available to the public" and met the other requirements of the statute. The superior court adopted this finding by the special master.

Accordingly, because there was no legal error in the analysis of the issue and our review of the record supports the factual findings adopted by the superior court, we find no error in the court's ruling.

(b) We further reject the position that information is not protectable as a trade secret merely because it may be independently discovered or ascertained by others. Although information is accorded trade secret status under OCGA § 10-1-761 (4) in part because it is not "readily ascertainable by proper means," id. at (A), Georgia law recognizes that trade secrets may be acquired by others either through independent development or by reverse engineering,[2] and that the

---

[1] The entirety of the logistics system was stated "to include all significant features of its computer hardware and software and its warehouse features, equipment and layout."

[2] "Reverse engineering occurs when an entity starts with a known product and, working backwards, divines the process which aided in its manufacture. [Cit.]" *Westech Gear Corp. v. Dept. of Navy*, 733 FSupp. 390, 392 (D.C. 1989).

acquisition of trade secret information by these means is not improper in the absence of any misappropriation. Id. at (1). Thus, the Act explicitly recognizes that trade secret information is protectable until it has been acquired by others by proper means. This position is consistent with that taken in the Restatement, supra at § 39 (f), p. 432.

> The theoretical ability of others to ascertain the information through proper means does not necessarily preclude protection as a trade secret. Trade secret protection remains available unless the information is readily ascertainable by such means. Thus, if acquisition of the information through an examination of a competitor's product would be difficult, costly, or time-consuming, the trade secret owner retains protection against an improper acquisition, disclosure, or use . . . . However, any person who actually acquires the information through an examination of a publicly available product has obtained the information by proper means and is thus not subject to liability. [Cit.] Similarly, the theoretical possibility of reconstructing the secret from published materials containing scattered references to portions of the information or of extracting it from public materials unlikely to come to the attention of the appropriator will not preclude relief against the wrongful conduct . . . .

Accord *Richardson v. Suzuki Motor Co.*, 868 F2d 1226, 1243 (IV) (B) (Fed. Cir. 1989) (information can be trade secret even if it is something that could be " 'discovered by others by their own labor and ingenuity' "); *Telex Corp. v. Intl. Business Machines Corp.*, 510 F2d 894, 929 (10th Cir. 1975) (information constituted a trade secret even though it could have been procured by a competitor "given enough time and expense, by independent investigation, research or experience"). See also *Water Svcs. v. Tesco Chemicals*, supra, 410 F2d at 163 (II) (trade secret is protected only as long as competitors fail to duplicate it by legitimate, independent research).

(c) Essex contends that information about Southwire's logistics system does not constitute a protectable trade secret because it reflects McMichael's knowledge, skill and experience. However, the facts in this case establish that Southwire is not complaining about the simple loss of expertise of its employee. Compare *Textile Rubber &c. Co. v. Shook*, 243 Ga. 587, 591 (255 SE2d 705) (1979). Naturally, the information McMichael brought to Essex would include general technical and business information or data readily available from other sources; however, Southwire adduced evidence showing that McMichael had information that specifically applied to the design

and start-up of a logistics system for a cable and wire company. The specific information McMichael possessed would not have availed another company that was not a direct competitor of Southwire.[3] In other words, McMichael brought to Essex not only the general information acquired in his job, i.e., that a certain logistical factor such as the positioning of storage containers would need to be resolved before certain other factors were decided: McMichael also brought specific information, such as how, where, and when those storage containers had to be positioned so as to accommodate most efficiently the very same product Essex was producing in competition with Southwire. It was the disclosure of this specific information that Southwire sought to enjoin and the record supports a finding that Southwire carried its burden of proving that McMichael possessed not only general logistics information, but also particularized information learned solely through his position of trust at Southwire. We find no error in the superior court's recognition of this information as a trade secret.

(d) Contrary to Essex's contention, the evidence is sufficient to support the special master's finding, as adopted by the superior court, that Southwire took reasonable efforts to maintain the secrecy of its logistics system. Compare *Servicetrends, Inc. v. Siemens Medical Systems,* 870 FSupp. 1042 (C) (2) (N.D. Ga. 1994).

In conclusion, we find that the superior court was authorized to conclude from the evidence that Essex sought to obtain, by the simple act of hiring McMichael, all the logistics information it had taken Southwire millions of dollars and years of testing and modifications to develop as part of Southwire's plan to acquire a competitive edge over other cable and wire companies such as Essex. Accordingly, we find no error in the superior court's judgment holding that Southwire's logistics system as a whole constituted a trade secret under OCGA § 10-1-761 (4).[4]

2. Essex also contends that the permanent injunction entered by the superior court is vague, overbroad and extends for more than a reasonable period of time. "Equitable relief is generally a matter within the sound discretion of the trial court. [Cit.] The action of the trial court should be sustained on review where such discretion has not been abused. [Cit.]" *Prime Bank v. Galler,* 263 Ga. 286, 288 (4)

---

[3] For example, had McMichael taken a position overseeing the logistics system start-up at a company that manufactured a totally different product, like pet goods or kitchen wares, he could be said to be utilizing his general knowledge regarding the manner in which a logistics system should be designed, since there would be no practical application for the specific, protected information he obtained while working at Southwire about the precise design that maximized a logistics system for a cable and wire business.

[4] Because we uphold the superior court's ruling that Southwire's logistics system as a whole constituted a trade secret, we need not address Essex's argument regarding the computer software aspect of the logistics system.

(430 SE2d 735) (1993). Reviewing the superior court's order granting Southwire a permanent injunction in light of the complexity of the trade secret at issue in this case, the detailed instructions provided by the superior court to the verifier in the verification order, and the court's recognition that the injunction need continue no longer than it takes Essex to develop its own logistics system independently, we find the superior court did not abuse its discretion by imposing the injunction in this case. See generally *Electronic Data Systems Corp. v. Heinemann*, 268 Ga. 755 (3) (493 SE2d 132) (1997).

(a) As to the vagueness claim, the verification order places on the verifier the responsibility to monitor the development of Essex's software, its warehouse layout designs, and vendors of certain specially-modified equipment. The verification order requires a comparison of Southwire's software with the software Essex develops; requires a comparison of the specific Southwire warehouse layout attached to the order with Essex warehouses inspected by the verifier; and contains an attachment listing the vendors and the customized equipment covered by the order. The verification order provides for the verifier to report other matters to the special master for his review and authorizes either party to request the special master's review of any action taken by the verifier. Given the description of the acts to be restrained and the specificity in the terms of the injunction, see OCGA § 9-11-52, we do not find the injunction order to be invalidly vague.

(b) Contrary to Essex's contention regarding the overbreadth of the order, the superior court explicitly stated in the verification order that the court "did not find that each and every individual feature of Southwire's warehouse layout is, in and of itself, a trade secret, but rather that Southwire's selection and arrangement of the multiple features which constitute its layouts is a trade secret." Accordingly, the superior court provided for the verifier to determine whether the layout Essex used was "the same as or so similar, in whole or in any significant part, . . . so as to call into question a violation of the Court's Order," before proceeding to determine whether the duplication or similarity was derived from information brought to Essex from Southwire by McMichael. We find that the injunction order, as implemented by the verification order, imposes upon Essex no greater restriction than necessary to protect Southwire from being injured by McMichael's potential disclosure to Essex of Southwire trade secrets. Compare *Prime Bank v. Galler*, supra, 263 Ga. at 288 (4).

(c) Finally, although the superior court enjoined Essex for five years, it made provision in its order and through the verification process to accommodate Essex's independent development of its own logistics system. The injunctive relief ordered is thus consistent with

OCGA § 10-1-762 (a), which provides that "an injunction shall be terminated when the trade secret has ceased to exist." See also *Thomas v. Best Mfg. Co.*, 234 Ga. 787, 789 (3) (218 SE2d 68) (1975), a pre-Act opinion consistent with the Act, in which this Court recognized that a trade secret is entitled to protection until the trade secret holder's competitors are able to duplicate the system by legitimate, independent research. See also OCGA § 10-1-761 (1). Accord Georgia Jurisprudence Business and Commercial Law, Vol. 4, Torts and Trade Regulation, § 9:20. Accordingly, we do not agree with Essex that the injunction is invalid because it extends for an unreasonable period of time.

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 29, 1998.

*Hawkins & Parnell, H. Lane Young II, Stephen M. Lore, Lawrence J. Myers, W. Harrison Coleman, Jr.,* for appellants.

*Smith, Gambrell & Russell, James H. Bratton, Jr., Herbert M. Hanegan, Margo A. Bagley, Tisinger, Tisinger, Vance & Greer, J. Thomas Vance,* for appellee.