[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 97-9285

_____

D. C. Docket No. 1:96-CV-453-GET

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
11/13/98
THOMAS K. KAHN
CLERK

CAPITAL ASSET RESEARCH CORPORATION,

Plaintiff-Counter-Defendant-
Appellee,

versus

ROGER FINNEGAN,
BREEN CAPITAL HOLDINGS, INC.,

Defendants-Counter-
Claimants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(November 13, 1998)**

Before ANDERSON and BARKETT, Circuit Judges, and HILL, Senior Circuit Judge.

BARKETT, Circuit Judge:

Roger Finnegan and Breen Capital Holdings Corp. ("Breen") appeal an adverse judgment

entered after a bench trial holding that they violated the Georgia Trade Secrets Act of 1990. The

district court held that Finnegan and Breen had misappropriated from Finnegan's former

employer, Capital Asset Research Corp. ("CARC"), protected information regarding the

economic value of certain real property in Fulton County, Georgia. The district court enjoined

Finnegan from having any dealings with these properties for one year and awarded CARC attorneys' fees and costs. On appeal, Finnegan and Breen challenge the district court's finding that the information in question was a trade secret under Georgia law as well as the relief ordered by the district court. We reverse, concluding that the district court erred in deeming the information Finnegan allegedly took from CARC a trade secret under Georgia law.

## I.      Background

CARC, a Florida corporation, and Breen, a New Jersey corporation, are sizeable institutional players in the business of purchasing tax liens from state and local governments. CARC's business in Georgia consists primarily of purchasing tax executions (or liens) and tax deeds on real properties for which property taxes are owed. CARC acquires a tax lien on the property by paying the delinquent taxes. If the property owner subsequently fails to satisfy the lien, and foreclosure proceedings take place, CARC bids on the deed to the property itself at public auction. Both CARC and Breen look to generate capital and profit by acquiring properties at bargain rates.

In September 1994, CARC hired Finnegan to establish CARC's business in the State of Georgia, particularly to negotiate bulk contract purchases of tax liens on behalf of CARC and to facilitate the acquisition of tax deeds. Through his own company, T.D. Investments ("TDI"), Finnegan helped negotiate a contract with Fulton County, Georgia for CARC's bulk purchase of delinquent tax executions for the tax years 1988 through 1993.

After Finnegan's employment relationship with CARC began to deteriorate in 1995, Finnegan met with Douglas Breen on several occasions during the latter half of that year to discuss the possibility of employment with Breen. Finnegan ultimately signed on as an

employee of Breen in January 1996. Despite this change in employment, TDI remained under contract with CARC until March 1996 in order to administer the foreclosure process on the Fulton County tax executions which CARC had already purchased with Finnegan's assistance. Finnegan therefore remained involved in CARC's day-to-day operations in Georgia until this time.

In February 1996, CARC filed this diversity action in federal district court against Finnegan,[1] alleging breach of contract and both actual and threatened violation of the Georgia Trade Secrets Act of 1990, O.C.G.A. § 10-1-760, et seq. (1997) ("the Act"). On May 7, 1996, Fulton County placed for auction a number of the tax deeds on properties for which Finnegan did the tax execution and foreclosure work for CARC. At the auction, Finnegan served as Breen's agent and competed with CARC for the purchase of the tax deeds. Finnegan outbid CARC on twenty-four properties. CARC subsequently alleged that Breen acquired those twenty-four properties as a result of Finnegan's misappropriation of trade secret information from CARC, and further claimed actual damages from that misappropriation in the amount of just over $30,000.

After a bench trial, the district court found against CARC on its allegations of breach of the non-compete clauses of its contract with Finnegan, but concluded that Finnegan had misappropriated a computer diskette from CARC containing information which constituted a trade secret under the Act. After finding that Finnegan had used the information to CARC's disadvantage, the district court awarded CARC $30,694.93 in damages and entered an injunction

---

[1] The complaint also names Breen as a defendant, but for simplicity's sake, we shall refer to both Finnegan and Breen collectively as "Finnegan."

3

enjoining Finnegan from having any dealings for one year with the properties included in CARC's $27 million portfolio of tax executions. Subsequently, the district court awarded CARC attorney's fees and costs in the amounts of $46,504.75 and $3,090.00 respectively. Finnegan appealed the district court's judgment on CARC's trade secret claim and the relief entered pursuant to it.

## II. Discussion

A claim for misappropriation of trade secrets under the Georgia Trade Secrets Act requires a plaintiff to prove that "(1) it had a trade secret and (2) the opposing party misappropriated the trade secret." Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp., 139 F.3d 1396, 1410 (11th Cir. 1998). The party asserting the existence of a trade secret has the burden of proving that the information so qualifies and that the accused party violated the Act. Essex Group, Inc. v. Southwire Co., 269 Ga. 553, 557 (1998); Salisbury Labs., Inc. v. Merieux Labs., Inc., 735 F. Supp. 1555, 1568 (M.D. Ga. 1989), aff'd, 908 F.2d 706 (11th Cir. 1990). The Act defines a "trade secret" as

> information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information:
>
> (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

4

O.C.G.A. § 10-1-761(4) (1997). Even if all of the information is publicly available, a unique

compilation of that information, which adds value to the information, also may qualify as a trade

secret. Essex, 269 Ga. at 554-55; Salsbury Labs., 908 F.2d at 710-12.[2]

> With reference to the alleged trade secret asserted by CARC, the district court found that

> CARC gave TDI a diskette containing CARC's information about the properties for sale during the May 1996 tax lien sale. TDI entered the data on the properties into TDI's computers. Thus, at least until March 18, 1996, TDI had a great deal of relevant information on the properties for sale during the May 1996 tax lien sale.

From this finding, the district court concluded that

> Finnegan violated the Georgia Trade Secrets Act by misappropriating and using the property information concerning the $27 million portfolio that was available for purchase during the May 7, 1996 tax lien sale ... [; that] CARC ha[d] proven that the information about the $27 million portfolio ... [is] a method, program or formula not commonly known or available to the public, from which CARC derived economic value ... [; and that] CARC ha[d] shown that Finnegan and Breen used the trade secret when Finnegan acquired the twenty-four properties during the May 1996 tax sale because Finnegan, at least until March 1996 when TDI's contract was terminated with CARC, had access to relevant information regarding all of the properties for sale in May 1996.

> We note initially that CARC conceded at oral argument that, notwithstanding the district

court's findings that Finnegan took a computer diskette from CARC and the computer diskette

contained trade secret information, no diskette was ever introduced into evidence and there is no

such diskette in the record. Indeed, CARC conceded that any discussion of a computer diskette

and its contents is irrelevant to the trade secret claims made in this case. Thus, we must look

elsewhere in the record for support for the district court's conclusion that CARC possessed some

___

[2] We apply the clearly erroneous standard to a district court's determination that a particular type of information is a trade secret because such determination involves a question of fact. Camp Creek, 139 F.3d at 1410-11 (citing Wilson v. Barton & Ludwig, Inc., 163 Ga. App. 721, 724-25 (1982)).

"method, program or formula not commonly known or available to the public, from which CARC derived economic value" and regarding which CARC took reasonable efforts to maintain secrecy. We are unable to find such support.

The testimony regarding the "method" or "formula" which constitutes CARC's alleged trade secret describes the process by which CARC evaluates the amount to be bid on a tax deed. That process involves the consideration of the following information: the assessed value of the property; the valuation reports on the property produced by third-party real-estate information database services; the attributes of the property and the neighborhood based on "drive-bys" of the site by CARC employees; and a prediction of the property owner's likelihood of redeeming the tax liens and making interest payments based on the specific owner's payment record and CARC's national averages of tax redemption behavior. After compiling this information to arrive at a valuation of the property, CARC factors in its own financial constraints imposed by its institutional lenders to determine the maximum bid price at which it believes it can make a reasonable profit on the purchase of the tax deed at auction. CARC claims as trade secrets its compilation of property-specific information, its national database on tax redemption behavior, and its final bid guidelines for tax deeds sold at auction.

There is no question that the vast bulk of the information CARC uses in this process is available to the public or that the method utilized by CARC is the same basic method by which any informed buyer would prepare to submit an intelligent bid at any auction. The official assessed values of properties for tax purposes are a matter of public record. CARC derives its historical information about the property and the quality of the neighborhood, according to CARC's Vice-President, "just by reading the newspapers and being in tune with the local realty

6

market," methods which are clearly available to the public. The private computer databases containing relevant information about the properties are fee services provided by third parties and are commonly used throughout the real estate industry. And, obviously, anyone is free to drive by and physically observe the neighborhoods and the properties. Finally, because the specific properties scheduled to be sold at auction are advertised in the newspaper four weeks prior to the auction, a person experienced in the trade has sufficient time to compile the information from these public sources before the auction. Thus, as CARC's Vice-President admitted, a person interested in purchasing at auction any of the tax deeds to the properties in CARC's tax lien portfolio could utilize these public sources of information in the several weeks leading up to the auction to make a competitive bid.

The only considerations left which could comprise trade secret information are the property owner's redemption records, and the amount that CARC was prepared to bid on each property at the auction. Neither of these considerations finds adequate support in the record to qualify as a trade secret. First, the payment records of the owners of the properties underlying the tax executions are a matter of public record. It is true that the testimony at trial established that the public records do not indicate the <u>dates</u> on which the owners made payments. That information can be gleaned from local government computer records of the redemption transactions, something not made public and actually discarded by the agencies on a regular basis. CARC purchases the agencies' computer records in order to ascertain this information and asserts that such information is a valuable predictor for redemption behavior. However, not only could these records also be purchased by others, but, more pertinently, CARC does not provide any evidence of how the information gleaned from them works as a predictor or why

7

that information is meaningful in the valuation of a tax deed. The same lack of evidence hampers CARC's claim that its database of nationwide tax redemption behavior warrants trade secret status. Although CARC's witnesses testified that its nationwide statistics are useful predictors of whether and how long it might take an individual property owner to pay off the tax debt owing on his or her property, those witnesses failed to explain specifically how that information would be useful to valuing the tax deed to the property. Consequently, on this record, it is impossible for a court to say that either form of tax redemption behavior information meets the definition of a trade secret under the Act.

The same is true for CARC's "bid guidelines." As described earlier, these numbers represent the product of CARC's overall assessment of the value of the tax deed (based on all of the information discussed above) and the "lending guidelines" imposed by CARC's institutional investors. The lending guidelines are essentially the amount of money that the investor, in this case Lehman Brothers, is willing to front for the purchase of a particular tax deed. Although CARC meets with its investors to determine the investors' guidelines on each property before a sale, CARC's Vice-President admitted that CARC does not have an exclusive relationship with its institutional lenders and that a competitor, like Breen, could have "access to the very same lending criteria." In other words, it is possible that a competitor could generate ceiling bids similar to CARC's through publicly available information -- wholly legitimate means.

CARC failed to explain, beyond the most general of assertions, how a competitor, armed with its own information about the value of the underlying properties and its own financial considerations, could reap economic value from knowledge of CARC's "bid guidelines." There may conceivably be some conditions under which knowledge of a competitor's maximum

8

possible bid could work to a bidder's advantage, but those conditions are not present here.  At oral argument CARC conceded that it was not claiming that Finnegan had obtained or even memorized the specific amount CARC was prepared to bid on each property to be auctioned in May 1996.  Rather, it argued that Finnegan had learned CARC's method of calculating an appropriate bid price for a particular piece of property (a method that CARC contends is a company secret) and that Finnegan used his knowledge of this method to reconstruct CARC's bid guidelines before the auction.  The problem with this argument is that CARC's method -- assembling public information about the value of a property and deciding what bid amount represents the permissible financial risk -- is simply not a trade secret.   It is something that any sufficiently informed and experienced bidder can and would do.  Therefore, CARC's compilations of information in the form of its "bid guidelines" are not "'unique combination[s], afford[ing their possessor] a competitive advantage.'" Essex, 269 Ga. at 554 (quoting Water Servs., Inc. v. Tesco Chemicals, Inc., 410 F.2d 163, 173 (5th Cir. 1969)).

Because we reverse the district court's finding that CARC proved that its "property information" is a trade secret under the Act, we also reverse the district court's award of attorneys' fees to CARC.  We need not address Finnegan's contention that the year-long injunction which the district court imposed against him (and which has since expired) was legally invalid.

**REVERSED and REMANDED.**

9