**PENALTY KICK MANAGEMENT LTD., Plaintiff,**

v.

**THE COCA–COLA COMPANY, Defendant.**

**No. 1:97–CV–1821–CAM.**

United States District Court, N.D. Georgia, Atlanta Division.

March 28, 2001.

Robert L. Lee, Alston & Bird, Atlanta, GA, for Printpack, Inc., movants.

Kirby Loftin Turnage, Jr., Office of Kirby L. Turnage, Atlanta, GA, Douglas V. Rigler, phv, Thomas R. Kline, phv, Charles M. Crout, phv, Andrews & Kurth, Washington, DC, for Penalty Kick Management Ltd., plaintiffs.

Robert Allan Boas, Joel Martin Neuman, The Coca–Cola Company, Richard Paul Decker, William, Winston, Briggs,

Decker & Hallman, Atlanta, GA, Joel W. Benson, phv, Jerold A. Jacover, phv, Brinks, Hofer, Gilson & Lione, Chicago, IL, for Coca–Cola Company, defendants.

### *ORDER*

MOYE, District Judge.

Plaintiff, Penalty Kick Management Ltd., filed this case seeking to recover from Defendant, The Coca–Cola Company, for conversion, misappropriation of trade secret, breach of contract, breach of a confidential relationship and duty of good faith, unjust enrichment, and quantum meruit, all relating to Defendant's use of a marketing and promotional concept and process similar to Plaintiff's "Magic Windows". The case is before the Court on Defendant's motions for summary judgment and to strike the damages report of Richard S. Higgins, or, in the alternative, to limit damages, and on Plaintiff's motion for leave to file a sur-reply relating to Defendant's motion to strike. For the reasons stated herein, the Court grants Defendant's motion for summary judgment and denies Defendant's motion to strike and Plaintiff's motion for leave to file as moot.

### FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts of this case were detailed in this Court's order of November 30, 2000, and will not be repeated here except as necessary to support the Court's findings.

In its complaint, Plaintiff included claims for conversion (Count I); misappropriation of trade secret pursuant to the Georgia Trade Secrets Act of 1990 (GTSA), O.C.G.A. § 10–1–760, *et seq.* (Count II); breach of contract (Count III); breach of a confidential relationship and duty of good faith (Count IV); unjust enrichment (Count V); and quantum meruit (Count VI). Defendant seeks summary judgment as to all claims.

### LEGAL STANDARDS AND ANALYSIS

Courts should grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court views the evidence in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Moreover, "[r]easonable doubts as to the facts should be resolved in favor of the nonmoving party," *Borg–Warner Acceptance Corp. v. Davis,* 804 F.2d 1580, 1582 (11th Cir.1986), "and all justifiable inferences are to be drawn in his favor," *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987). "For factual issues to be considered genuine, they must have a real basis in the record." *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 919 (11th Cir.1993). Additionally, issues of fact are genuine only if "they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The unsupported, self-serving statements of the party opposing summary judgment are insufficient to avoid summary judgment. *Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705, 714 (11th Cir.1984). Whether facts are material is determined by the applicable substantive law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. An issue is not genuine if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 249–50, 106 S.Ct. 2505. "In passing upon a motion for summary judgment, a finding of fact which may be inferred but not demanded by circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists." *Bald Mountain Park, Ltd., v.*

*Oliver,* 863 F.2d 1560, 1564 (11th Cir.1989) (quoting *Brewer v. Southeastern Fidelity Ins. Co.,* 147 Ga.App. 562, 564, 249 S.E.2d 668 (1978)).

Pursuant to the Georgia Trade Secrets Act (GTSA), actual or threatened misappropriation of trade secrets may be enjoined, O.C.G.A. § 10–1–762(a), and damages may be recovered for misappropriation, O.C.G.A. § 10–1–763(a). The GTSA "supersede[s] conflicting tort, restitutionary, and other laws of [Georgia] providing civil remedies for misappropriation of a trade secret," but does not affect "[c]ontractual duties or remedies, whether or not based upon misappropriation of a trade secret" or "[o]ther civil remedies that are not based upon misappropriation of a trade secret." O.C.G.A. § 10–1–767. "Trade secret" is defined as

information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information:

(A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.C.G.A. § 10–1–761(4).

 "The fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements." *Essex Group, Inc. v. Southwire Co.,* 269 Ga. 553, 554, 501 S.E.2d 501 (1998) (quoting *Restatement of the Law 3d.,* Unfair Competition (1995), § 39(f), p. 432).

[A] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which in unique combination, affords a competitive advantage and is a protectible [protectable] secret.

*Id.* (quoting *Water Services, Inc., v. Tesco Chemicals, Inc.,* 410 F.2d 163, 173 (5th Cir.1969)).

[A] trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful and valuable integration of the public domain elements and the trade secret gave the [trade secret owner] a competitive advantage which is protected from misappropriation.

*Id.* (quoting *Rivendell Forest Products v. Georgia–Pacific Corp.,* 28 F.3d 1042, 1046 (10th cir.1994)) (changes in *Essex Group* ).

A unique process which is not known in the industry "can be a trade secret even if all of its component steps are commonly known." In other words, "a trade secret process may be established even if known components are assembled and known techniques are combined to produce a useful process which is not known in the industry."

*Id.* at 554–55, 501 S.E.2d 501 (quoting *Salsbury Laboratories, Inc. v. Merieux Laboratories, Inc.,* 735 F.Supp. 1555, 1569 (M.D.Ga.1989), *aff'd,* 908 F.2d 706 (11th Cir.1990)).

 Many of the elements of Plaintiff's Magic Windows were included in the Virtual Images patent application, which describes a promotional concept using a coded message on the reverse side of a label requiring that the bottle be emptied so that the coded message can be decoded

through a transparent window. The promotional concept detailed in the Virtual Images application, however, describes an "embossed hologram" image that is decoded by viewing it through a region of the label that "does not bear ink." A completely different section of the application notes that, although color has been used for coding messages which are decoded by viewing them through colored filters, "[t]his method provides only limited image security, since careful inspection of the encrypted image without the color filter can usually reveal the 'hidden' image." Finally, nothing in the Virtual Images application dealt with the sort of production elements used for Plaintiff's Magic Windows labels. Thus, Plaintiff had "accomplished an effective, successful and valuable integration of the public domain elements," *Essex Group*, 269 Ga. at 554, 501 S.E.2d 501, and its Magic Windows label was a "trade secret" within the meaning of the GTSA. Because Plaintiff's claims for conversion, breach of confidential relationship and duty of good faith, unjust enrichment, and quantum meruit are all premised upon Defendant's disclosure of Plaintiff's Magic Windows concept and technology, they are superseded by the GTSA, and Defendant is entitled to summary judgment as to Counts I, IV, V, and VI.

■ "Georgia law recognizes that trade secrets may be acquired by others either through independent development or by reverse engineering, and that the acquisition of trade secret information by these means is not improper in the absence of any misappropriation." *Id.* at 555–56, 501 S.E.2d 501 (citing O.C.G.A. § 10–1–761(1)). "Thus, the [Georgia Trade Secrets] Act explicitly recognizes that trade secret information is protectable until it has been acquired by others by proper means." *Id.* at 556, 501 S.E.2d 501.

The theoretical ability of others to ascertain the information through proper means does not necessarily preclude protection as a trade secret.... [I]f acquisition of the information through an examination of a competitor's product would be difficult, costly, or time-consuming, the trade secret owner retains protection against an improper acquisition, disclosure, or use.... However, any person who actually acquires the information through an examination of a publicly available product has obtained the information by proper means and is thus not subject to liability. Similarly, the theoretical possibility of reconstructing the secret from published materials containing scattered references to portions of the information or of extracting it from public materials unlikely to come to the attention of the appropriator will not preclude relief against the wrongful conduct.

*Id.* (citing Restatement of the Law 3d, Unfair Competition (1995) § 39(f), p. 432). "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit ·use, or espionage through electronic or other means. Reverse engineering of a trade secret not acquired by misappropriation or independent development shall not be considered improper means.

O.C.G.A. § 10–1–761(1). *"[I]t does not matter* whether Defendants actually utilized proper means to obtain the subject information" as long as it is "readily ascertainable by proper means" because "the focus of [the Georgia statute] is not upon the action of Defendants but upon the nature of the information." *AmeriGas Propane, L.P., v. T–Bo Propane, Inc.*, 972 F.Supp. 685, 699 (S.D.Ga.1997) (emphasis in original). "The inquiry simply boils down to the question: was this information

truly a *secret* ?" *Id.* at 700 (emphasis in original). "Trade secrets may be protected even in the absence of a written agreement, and will be protected so long as competitors fail to duplicate them by legitimate, independent research." *Salsbury Laboratories,* 908 F.2d at 710 (internal quotation marks omitted).

█ The Red Zone beverage label idea presented to Defendant by BrightHouse contains all of the elements of the Magic Windows concept: It is a "promotional concept . . . that requires purchasers of containers . . . to empty the contents of the container . . . to determine whether they have won a prize which was incorporated in a commercially feasible beverage label" which contains "non-embossed, two or three colored encrypted image or message on the inside or reverse side of the label that is visually incoherent which appears approximately opposite . . . from a colored window filter which is used as a viewing mechanism to decode the image or message in visually coherent form." Plaintiff's Response to Defendant's Interrogatory No. 3. Additionally, the BrightHouse label used "a red window filter . . . as a viewing mechanism to decode the message." *Id.* The evidence before the Court shows that an idea virtually identical to Magic Windows was independently conceived by BrightHouse with no suggestions from either Defendant or Plaintiff. Therefore, the idea of using a beverage label such as Magic Windows was not misappropriated from Plaintiff within the meaning of the GTSA because it was independently developed by BrightHouse.

Defendant gave ITW a mock-up of a Magic Windows type label to determine whether ITW could create such a label. The parties disagree as to whether the mock-up was the one given to Defendant by Plaintiff or was one created by Defendant. The origin of the specific mock-up given to ITW is irrelevant under the facts

of this case because Defendant could have created a mock-up using the idea it legitimately received from BrightHouse. *See AmeriGas Propane,* 972 F.Supp. at 699 ("the focus of [the GTSA] is not upon the action of Defendants but upon the nature of the information").

The labels created by ITW and used by Defendant for the Argentina promotion, although conceptually similar to Magic Windows, were independently developed by ITW using different production elements than those used for Plaintiff's Magic Windows. Jeffrey Albaugh, of ITW, testified at deposition that he was shown a sample bottle and label for Defendant's Argentina promotion and asked if ITW could print that type of label. Deposition of Jeffrey Albaugh at 34 (February 27, 1998). He further testified he was not given any instruction on how to create the sample label he had been shown. *Id.* at 37. Specifically, Albaugh testified he knew from past experience the ink color sequence to use, *id.* at 39, and he made that decision, *id.* at 76; he was not given information as to where the coded message had to be located on the label, *id.* at 41, except that Coke Argentina suggested lowering the coded message because "they were afraid that people c[ould] actually tip the bottle, on some of the smaller bottles, and they m[ight] be able to read that message, so they put it closer down to the bottom," *id.* at 59; he was not given any direction with respect to what film to use, *id.* at 41; during the time he was working on test labels, he had no discussions with any of Defendant's representatives, *id.* at 43, nor did he seek advice from Defendant or get advice from Defendant, *id.* at 44; Defendant provided no materials used to create the sample press run, *id.;* he got no instruction from Defendant "on how to create the scenario so that the [coded] message could be viewed," *id.* at 56; he made the decision on how to construct the scrambled text, *id.* at 80; and he made the

**1382**

decision on how to block the text from being read before the product was consumed, *id.* at 81. Albaugh further testified that, after having done a successful press run of the sample label, ITW showed the label to Defendant in Atlanta, but was not "given any direction with respect to how to create the label," *id.* at 52, other than shifting the coded message lower on the label as noted above, and that he made no material changes to the printing process for the final labels, *id.* at 46–49. Finally Albaugh testified that there was nothing new about the printing process used to print the labels for the Argentina promotion: "It was just simple, everyday printing, with just an objective of a clear window being able to see through to the back side." *Id.* at 71.

Although Plaintiff suggests that notes made by Defendant's representatives during meetings with ITW may be interpreted to create fact issues as to whether Defendant assisted in producing the labels for the Argentina promotion, these notes cannot overcome Albaugh's uncontested testimony. *See Bald Mountain Park,* 863 F.2d at 1564 ("a finding of fact which may be inferred but not demanded by circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists."). The printing process used for printing labels for the Argentina promotion labels was not misappropriated from Plaintiff within the meaning of the GTSA because it was independently developed by ITW.

Defendant did not misappropriate Plaintiff's Magic Windows labels, either the concept or the actual printing process, and is entitled to summary judgment as to Count II.

The Non–Disclosure Agreement signed by Plaintiff and Defendant permitted Defendant to disclose information that "at the time of disclosure, is available to the public" or "is rightfully received from a third party." Thus, Defendant did not breach the Agreement because the Magic Windows concept was rightfully received from BrightHouse, and the labels actually used by Defendants were independently developed by ITW from "simple, everyday printing" techniques. Defendant is entitled to summary judgment as to Count III.

## CONCLUSION

For the reasons stated herein, the Court GRANTS Defendant's motion for summary judgment [73–1]. Defendant's motion to strike the damages report of Richard S. Higgins or, in the alternative, to limit damages, [74–1] and Plaintiff's motion to file a sur-reply relating to Defendant's motion [91–1] are denied as moot.

*Clerk of Court* is directed to enter judgment for Defendant on all counts. This closes the case.