A06A1392. DOUGLAS ASPHALT COMPANY v. E. R. SNELL CONTRACTOR, INC. et al.
(639 SE2d 372)

BARNES, Judge.

E. R. Snell Contractor, Inc. and ten other contractors applied for an injunction against the Georgia Department of Transportation to prevent the agency from giving copies of certain documents to Douglas Asphalt Company in response to its Open Records Act request. The contractors contended that the documents, which the companies submitted to the DOT pursuant to their roadway paving contracts, contained trade secrets and thus were exempt from the Act. Douglas Asphalt was granted permission to intervene, and objected to the application. Following a bench trial, the trial court permanently enjoined the DOT from giving unredacted copies of the documents to Douglas Asphalt, specifying which information was to be redacted. For the reasons that follow, we affirm.

As the trial court found, the asphalt industry is highly competitive, with profit margins from one to five percent. Material costs make up the largest portion of overall costs, and thus the companies expend significant resources tweaking their asphalt formulas to reduce those costs, some through their own full-time state-certified laboratory technicians and others through outsourcing. The cost for material per ton can vary a great deal, depending on the mix design. Asphalt is composed of aggregate or crushed stone, liquid asphalt, and minor

additives such as lime, which is an anti-stripping agent, and the liquid asphalt, which is a form of crude oil, is the most costly ingredient. Some companies use recycled asphalt product (RAP) as a component, which lowers the amount of liquid asphalt required and thus lowers the material costs. Other factors affecting cost are the source locations, and the porosity, size, and amount of the aggregate.

The Georgia DOT establishes the property specifications of the finished asphalt product, and contractors submit proposed design mix formulas to the DOT for approval before bidding on a job. Once those formulas are approved, they are kept on file and the contractor can refer to them when it bids on a project. All DOT projects are bid in a closed process, so that no one knows the amount anyone else is bidding, and the lowest bid is awarded the job. Once it is awarded a contract, the contractor submits a Job Mix Formula for DOT approval before beginning the job, based on the previously approved formula, and includes the percentages and sources of each material.

Once the formula is approved and the contractor begins work, it submits a form document called a 159 Worksheet every day. The 159 Worksheet reports the results of tests run on the asphalt in place or at the plant. It includes some of the information contained on the Job Mix Formula, plus the test data and the quantity of material laid that day. The number given for the "pay factor" reveals whether the contractor is performing according to the terms of its contract. A pay factor of one means the contractor was paid 100 percent of the agreed-upon cost per unit, based on whether or not the asphalt it placed fell within the required contract specifications. A pay factor of 0.9 means the contractor was paid 90 percent of agreed unit cost, because the asphalt did not fall within the required contract specifications, and if it falls too far outside the specifications, the DOT would make the contractor take it up and place it again.

A competitor could derive the mix design from the information on these two forms, and would gain a competitive advantage in future bidding. For example, the quantity of material laid tells a competitor the company's ability to produce and place asphalt. The source of goods affects cost, because the further the source from the job, the higher the freight costs will be. The liquid asphalt percentage is important information, because if a competitor knows that a company is using a mix design with 4.4 percent liquid asphalt, it needs to bid using a mix design with 4.3 percent liquid asphalt. If a competitor knows a company is using RAP, it knows that the material costs are lower than if it were using a design mix without RAP.

The DOT Office of Materials and Research Standard Operating Procedure regarding the control of these mix designs provides that

[m]ix designs shall be made available only to the designer and to users authorized by the designer. Mix designs are considered to be proprietary information. They are not subject to public disclosure under the Georgia Open Records Act by virtue of OCGA § 50-18-72 (b) (1), which protects the confidentiality of trade secrets obtained from a business entity that are confidential and required to be submitted to a government agency.

Further, a December 2004 interdepartmental memorandum from a state asphalt design engineer with the materials and research office reminded all DOT personnel that documents regarding mix designs produced by commercial laboratories were confidential and proprietary. Copying and dissemination of designs and design data, which were trade secrets not subject to public disclosure under the Open Records Act, should be strictly controlled and limited to designated personnel. The nondisclosure of mix design data has been the official DOT policy since at least 1998, when the DOT stopped creating its own mix designs that were available to all and began accepting mix designs created by private laboratories. The contractors testified that they spent a great deal of money to develop these mix designs and severely restricted access to the information to protect its confidentiality. An assistant state materials and research engineer testified that if a contractor has a competitor's Job Mix Formula form, it has much of the information in the mix design because it knows the combined gradation of the aggregate, the liquid asphalt percentage, and other information critical to the design. While it would not know the competitor's costs, it would know its own cost for the same mix, which would enable it to bid more competitively.

In this case, Douglas Asphalt filed an Open Records Act request with the DOT seeking copies of every Job Mix Formula form and 159 Worksheet form submitted by any road contractor to the agency from 1997 to 2003. The trial court concluded that some information in these forms contained trade secrets, as defined by OCGA § 10-1-761 (4), and permanently enjoined the DOT from disclosing certain portions of the information on these documents.

Douglas Asphalt contends that the trial court erred in permanently enjoining the DOT from disclosing certain designated portions of public records. "The findings of fact in a nonjury trial are analogous to a jury verdict and will not be interfered with if there is any evidence to support them." (Citation omitted.) *Lowry v. Hamilton*, 268 Ga. 373, 374 (2) (489 SE2d 827) (1997). We review the trial court's conclusions of law de novo. *Hibbard v. P.G.A., Inc.*, 251 Ga. App. 68, 69 (1) (553 SE2d 371) (2001).

The Open Records Act provides that "[a]ll public records of an agency ... shall be open for a personal inspection by any citizen of this state at a reasonable time and place." OCGA § 50-18-70 (b). The purpose of the Open Records Act is "to encourage public access to government information and to foster confidence in government through openness to the public," (citation omitted) *McFrugal Rental &c. v. Garr*, 262 Ga. 369 (418 SE2d 60) (1992), and exemptions from disclosure should be narrowly construed. OCGA § 50-18-72 (g); *Hardaway Co. v. Rives*, 262 Ga. 631, 634 (2) (a) (422 SE2d 854) (1992). The act does not apply to "[a]ny trade secrets obtained from a person or business entity which are of a privileged or confidential nature and required by law to be submitted to a government agency. . . ." OCGA § 50-18-72 (b) (1). Our law defines "trade secrets" as

> information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information: (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

OCGA § 10-1-761 (4). "Whether a particular type of information constitutes a trade secret is a question of fact." (Citation and punctuation omitted.) *Insight Technology v. FreightCheck*, 280 Ga. App. 19, 27 (3) (633 SE2d 373) (2006).

1. Douglas Asphalt contends that the redacted information could not be a "trade secret" because it was readily ascertainable by actually testing the material used on the job. The public owns the roads, and has the right through a representative to test the asphalt placed on the road by the contractors pursuant to a state contract, it argues. We have held, before the 1990 Trade Secrets Act, that "a trade secret is only protected so long as competitors fail to duplicate it by legitimate, independent research. [Cit.]" *Monumental Properties of Ga. v. Frontier Disposal*, 159 Ga. App. 35, 38 (3) (282 SE2d 660) (1981). "[A] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which in unique combination, affords a competitive advantage and is a protectable secret."

(Citation and punctuation omitted.) *Essex Group v. Southwire Co.*, 269 Ga. 553, 554 (1) (a) (501 SE2d 501) (1998).

The testimony in this case established that the mix design is not readily ascertainable and cannot be duplicated by independent research. The quality control manager for E. R. Snell Contractor testified that one could not derive the mix design from a core sample of the roadway. No evidence at trial established that this information was readily obtainable; to the contrary, several witnesses testified that the contractors took great care to keep this information secret and that it was not available to the public through any means.

> The fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements. Hence, even if all of the information is publicly available, a unique combination of that information, which adds value to the information, also may qualify as a trade secret.

(Citations and punctuation omitted.) *Penalty Kick Mgmt. v. Coca Cola Co.*, 318 F3d 1284, 1291 (II) (A) (11th Cir. 2003). The trial court did not err in concluding that the contractors presented evidence that the information derived economic value from not being generally known or readily ascertainable to others.

2. Douglas Asphalt asserts that selling the asphalt product to the public places it in the public domain and destroys any reasonable expectation of secrecy as to information showing whether the product complied with the contract requirements, citing *Roboserve, Ltd. v. Tom's Foods*, 940 F2d 1441 (11th Cir. 1991). In that case, a vending machine manufacturer sued its customer for altering the machine so it would accept cups other than the manufacturer's, alleging a trade secrets violation. The court held that once the manufacturer sold the product, the buyer was free to modify the unpatented parts because the sale destroyed any reasonable expectation of secrecy by placing the machines in the public domain. Id. at 1455. The case did not hold that all confidential information regarding the manufacture of the machines became public knowledge when it was sold. Similarly, even if the asphalt product placed on Georgia roadways is public property, the confidential technical specifications of the mix design are not public property.

Further, the public can ascertain whether a contractor's asphalt product meets DOT requirements by examining information on the forms which was not included in the trial court's injunction. Specifically, the "pay factor" and "percent deviation" figures in the 159

Worksheet reveal whether the asphalt product met state specifications. If the pay factor is one, then the product has fully met the specifications and the contractor will be paid 100 percent of the contracted unit cost; if the number is 0.9, for example, then the product met only 90 percent of the specifications and the contractor will be paid 90 percent of the contracted unit cost. On the other hand, the public could not ascertain whether a contractor complied with his contract specification by examining any of the redacted information on these forms. The trial court did not err in enjoining disclosure of certain information on this ground.

3. Finally, Douglas Asphalt contends that the records do not fall within the exception to Open Records Act disclosure because the contractors were not "required by law" to submit the information to the DOT. The company argues that the contractors were not required by law to bid for the road projects, but did so voluntarily. When their bid was successful, they voluntarily entered into contracts that required them to submit the information to the DOT, unlike the company seeking trade secret protection in *Theragenics Corp. v. Dept. of Natural Resources*, 244 Ga. App. 829 (536 SE2d 613) (2000), aff'd, *Ga. Dept. of Natural Resources v. Theragenics Corp.*, 273 Ga. 724 (545 SE2d 904) (2001). Theragenics had no contractual relationship with the state, but was compelled by law to submit information to the Environmental Protection Division of the Department of Natural Resources because it used radioactive material in its manufacturing process.

We find no substantive distinction between these situations. While it is true that the contractors were not required by law to enter into contracts with the state, several witnesses testified that once they entered those contracts, they were required by law to submit the information to the DOT before starting or continuing work. Although no Georgia cases have addressed this particular issue, in a similar context federal courts have held that information that must be submitted in conjunction with a government contract is "required by law." See, e.g., *TRIFID Corp. v. Nat. Imagery & Mapping Agency*, 10 FSupp.2d 1087 (E.D. Mo. 1998). Douglas Asphalt notes that these cases involve the federal Freedom of Information Act, which materially differs from Georgia's Open Records Act, according to our Supreme Court. *Bowers v. Shelton*, 265 Ga. 247, 249 (1) (453 SE2d 741) (1995). That material difference relates to the respective agencies' obligations to avoid disclosing specified exempted information, and that difference is irrelevant to this case. The reasoning behind the determination that a contractor who submits documents necessary to fulfill a government contract is "required by law" to do so applies to both statutes. Further, "it is hard to envision how disclosure to a . . .

competitor of a private entity's confidential or proprietary information, which it was required to file with a state agency in order to operate a business in this state, would promote the purpose of the Open Records Act." *Theragenics Corp. v. Dept. of Natural Resources*, supra, 244 Ga. App. at 832.

*Judgment affirmed. Andrews, P. J., and Ellington, J., concur.*

DECIDED NOVEMBER 22, 2006 — 

*Vaughn, Wright & Boyer, Frederick L. Wright II*, for appellant.

*Troutman Sanders, Michael E. Johnson, Matthew R. Clark, Schreeder, Wheeler & Flint, David H. Flint, Coleman, Talley, Newbern, Kurrie, Preston & Holland, Wade H. Coleman, Smith, Currie & Hancock, Eric L. Nelson, Thompson, Slagle & Hannan, Alfred A. Malena, Jr., Thurbert E. Baker, Attorney General, Mary Jo Volkert, Assistant Attorney General, David M. Toolan, Sheldon K. Fram*, for appellees.