[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 24, 2003
THOMAS K. KAHN
CLERK

No. 01-12012

D. C. Docket No. 97-01821-CV-CAM-1

PENALTY KICK MANAGEMENT LTD.,

Plaintiff-Appellant,

versus

COCA COLA COMPANY,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Georgia

**(January 24, 2003)**

Before TJOFLAT and BIRCH, Circuit Judges, and GOLDBERG*, Judge.

_____
*Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

TJOFLAT, Circuit Judge:

Penalty Kick Management Ltd. ("PKM") brought this lawsuit against the Coca-Cola Company ("Coca-Cola"), seeking legal and equitable relief under theories of conversion, misappropriation of a trade secret, breach of contract, breach of a confidential relationship and duty of good faith, unjust enrichment, and quantum meruit. The district court granted summary judgment in favor of Coca-Cola as to all claims, and PKM appeals. We affirm.

## I.

### A.

In early 1995, PKM's Chief Executive Officer, Peter Glancy, conceived of a beverage label marketing and production process known as "Magic Windows." Magic Windows consisted of the following: a scrambled message on the inside of a beverage container label which could be decoded and read only after the beverage container was emptied. The message would be read through a colored filter printed on a label on the opposite side of the container, directly across from the coded message.

On November 2, 1995, Glancy and Charles Carter of PKM met with representatives of Coca-Cola to demonstrate Magic Windows. Glancy orally

2

advised the Coca-Cola representatives that the information concerning Magic Windows was confidential, and the representatives regarded it as such. Glancy also advised the representatives that PKM was pursuing global patent protection on Magic Windows,[1] and thus would be in a position to provide Coca-Cola the exclusive rights to the Magic Windows marketing tool.

A few months after the meeting, in February of 1996, the parties executed a *Non-Disclosure Agreement* in which each agreed not to disclose to any third party any confidential information shared during discussions regarding Magic Windows. However, the agreement went on to provide:

> [T]here is no obligation to maintain in confidence any information that:
>
> (i)  at the time of disclosure is available to the public;
>
> (ii)  after disclosure, becomes available to the public by publication or otherwise;
>
> (iii)  is in [Coca-Cola's or its subsidiaries' or affiliates' possession], at the time of disclosure [];

---

[1] Glancy applied for patents for Magic Windows in the United States and the United Kingdom. The U.S. patent application was rejected in July 1998 because Glancy's claims were anticipated by information in a 1993 international patent application filed by Virtual Image. After modifying the application, however, Glancy received a U.S. patent in 1999 covering some, but not all, aspects of Magic Windows.

(iv)  is rightfully received from a third party; [or]

. . .

(vi)  [Coca-Cola] can establish was subsequently developed independently by [Coca-Cola or its subsidiaries or affiliates] independently of any disclosure hereunder.

After the execution of the agreement, PKM and Coca-Cola representatives met again to discuss the possibility of Coca-Cola licensing Magic Windows for its exclusive use.  Following several months of discussions, on July 16, 1996, Coca-Cola drafted a *Development and License Agreement* in which, among other things, Coca-Cola proposed to pay PKM $1 million and a per label royalty for a global license giving Coca-Cola the exclusive right to use Magic Windows.[2]

Concomitant with sending its proposed license agreement, however, Coca-Cola undertook an intellectual property review of PKM's patent applications to determine, inter alia, whether PKM could actually provide Coca-Cola with exclusivity over the concept embodied in Magic Windows.  In the course of that

---

[2] Coca-Cola says the proposed agreement was offered based on representations from PKM that it had a firm offer from Pepsi International, with whom PKM was also meeting to discuss a possible licensing arrangement.

4

review, Coca-Cola unearthed a copy of the Virtual Image patent application published in May of 1993, and sent a copy of the application to Glancy on October 7, 1996. The Virtual Image patent application revealed that the two main concepts of Magic Windows – using a colored filter to decode a disguised message and placing the filter on the side of a bottle label opposite the coded message, already existed in prior art.[3] In view of the Virtual Image patent application, Coca-Cola concluded that the Magic Windows concept was in the public domain, and that PKM could not provide the patent exclusivity Coca-Cola was seeking. Accordingly, a month later, on November, 19, 1996, Coca-Cola informed PKM that it would "not pursue [an] exclusivity agreement" w[ith] them," and terminated all negotiations.

B.

---

[3] The Virtual Image patent application's prior art provided, in pertinent part:

Color has been employed to disguised images by printing an image in one color, then overprinting it with another image or pattern in a different color having approximately the same apparent brightness. Adjacent zones of equibrightness appear to visually blend, even though they are of different color, thereby confounding the perception of the original image. The encrypted image can be decrypted by viewing it through a color filter which blocks the image color and passes the confounding color. This method provides only limited image security, since careful inspection of the encrypted image without the color filter can usually reveal the "hidden" message.

PKM's presentation was not the first or only time that Coca-Cola had discussed window labels and decoder filters. Two other instances are particularly important in this case.[4] First, in November of 1995 (the same month PKM first met with Coca-Cola), Coca-Cola asked BrightHouse, an Atlanta-based ideation company, to create a promotion for the upcoming 1996 NFL season. One of the ideas presented by BrightHouse in December of 1995 was the creation of a bottle label with a scrambled message on the back inside of the label and a red decoder filter printed on the front side of the label. BrightHouse believed the concept would work, and proved its point with a graphic illustration and a bottle mock-up. Coca-Cola subsequently tested the BrightHouse concept with focus groups in order to gauge consumer reaction to a decoder bottle.

Second, in September of 1996 (while Coca-Cola was still negotiating with PKM), Coca-Cola met with Steve Everett, a salesman with ITW-Autosleeve (ITW), the regular printer for labels used on Coca-Cola's products in Argentina, to discuss a windows label promotion in Argentina. At this meeting, Coca-Cola representatives discussed the concept of the window label in general terms, showed Everett a mock-up of a bottle with a label, and asked if ITW was capable of

_____

[4] In addition to these two instances, Coca-Cola utilized color-encoded game pieces that were decoded by red filters in both 1981 and 1991.

6

manufacturing such a label. The label included a message that was printed off an ink-jet or bubble jet printer and was taped to the back side of the bottle; red litho paper was on the front side of the bottle. ITW informed Coca-Cola it could produce the label and set out to do so.

ITW's Graphic Arts Manager, Jeffrey Albaugh, was assigned the task. He was not given any instruction on how to create the sample label. Albaugh independently determined the type of printing press, inks, color sequences, and production processes needed. He alone did the following: constructed the scrambled text on the label; planned the print formula; selected the film to use as a substrate for the label; chose the color to use on the filter; figured how to block the scrambled message from being read from the outside; picked the weight and tone of the ink; established the printing setup; and decided whether to print on the surface or reverse print the label. Albaugh made these decisions based on his experience as a printer. He viewed the task as "simple, everyday printing" that did not require "anything new in technology." After approximately three weeks, Albaugh completed the bottle label. Coca-Cola subsequently used the label in an Argentinian marketing promotion.

In February of 1997, PKM learned of the Argentinian promotion. After viewing one of the Coca-Cola bottles, PKM was alarmed by (what it perceived to

7

be) the striking similarity between its Magic Windows label and the bottle label developed by ITW. Glancy called Coca-Cola to determine whether Coca-Cola had used the information PKM had shared to help create the ITW label. When Coca-Cola denied any wrongdoing, PKM filed this suit.

## C.

The complaint in this case is framed in six counts. Count I alleged that Coca-Cola converted PKM's Magic Label technology for its own use; Count II alleged that Coca-Cola misappropriated trade secrets when it divulged the disclosed information to ITW, who in turn, used that information to develop its label; Count III alleged that Coca-Cola breached the *Non-Disclosure Agreement* when it disclosed confidential information to ITW; Count IV alleged that Coca-Cola breached its confidential relationship and duty of good faith imposed by O.C.G.A. § 23-2-58; Count V alleged that Coca-Cola was unjustly enriched by utilizing PKM's design of, and production process for, the Magic Windows technology; finally, Count VI alleged that Coca-Cola failed to compensate PKM for the services and property provided to Coca-Cola.

Coca-Cola answered the complaint, denying liability on all counts. In short, Coca-Cola stated that the information revealed by PKM regarding Magic Windows

was not a trade secret, was not disclosed to ITW or any other third party, and was not used by Coca-Cola. Additionally, Coca-Cola had complied with the *Non-Disclosure Agreement*, and did not owe any money to PKM because it did not provide Coca-Cola with any valuable services or property. Rather, the Magic Windows concept was rightfully received by Coca-Cola during the BrightHouse presentation, and any other allegedly misappropriated elements of Magic Windows were independently developed by ITW using well-known printing techniques.

As part of its defense, Coca-Cola served an interrogatory on PKM asking PKM to identify every element of the Magic Windows technology that PKM contended was misappropriated by Coca-Cola. Plaintiff responded, in pertinent part,

> PKM contends that Coke misappropriated a promotional concept referred to as "Magic Windows," "Clear View Windows," and "Rear View Windows" that requires purchasers of containers (in the case of Coke, a beverage container) to empty the contents of the container to receive a message or to determine whether they have won a prize which was incorporated in a commercially feasible beverage label printed on a gravure or comparable press

with standard inks onto single-laminate, flexible plastic packaging material using a label production process and color sequences whereby up to eight colors can be utilized to print onto film, as a substrate, or reverse-printed, which leaves the plastic film facing forward and toward the viewer to create a beverage label with a non-embossed, two or three colored encrypted image or message on the inside or reverse side of the label that is visually incoherent which appears approximately opposite or approximately 180° from a colored window filter which is used as a viewing mechanism to decode the image or message in a visually coherent form.

From this response, Coca-Cola had an expert create a chart of the allegedly misappropriated elements:

| | Element | Type of Element |
|---|---|---|
| 1. | A promotional concept referred to as "Magic Windows," "Clear View Windows" and "Rear View Windows" | Concept |

| | | |
|---|---|---|
| 2. | that requires purchasers of containers (in the case of Coke, a beverage container) to empty the contents of the container | Concept |
| 3. | to receive a message or to determine whether they have won a prize | Concept |
| 4. | which was incorporated in a commercially feasible beverage label | Concept |
| 5. | printed on a gravure or comparable press | Production |
| 6. | with standard inks | Production |
| 7. | onto single-laminate, flexible plastic packaging material | Production |
| 8. | using a label production process and color sequences whereby up to eight colors can be utilized | Production |
| 9. | to print onto film, as a substrate, or reverse-printed, which leaves the plastic film facing forward and toward the viewer | Production |
| 10. | to create a beverage label with a non-embossed | Concept |
| 11. | two or three colored | Concept |
| 12 | encrypted image or message | Concept |
| 13. | on the inside or reverse side of the label | Concept |
| 14. | that is visually incoherent | Concept |
| 15. | which appears approximately opposite or approximately 180° | Concept |

| 16. | from a colored window filter | Concept |
| 17. | which is used as viewing mechanism to decode the image or message | Concept |
| 18. | in a visually coherent form | Concept |

PKM's expert generally agreed with the chart. Additionally, the district court adopted the chart in a November 30, 2000 Order (in which the court limited PKM's trade secret claim to the elements listed in the chart). PKM did not object to the court's adoption of the chart.

Several months later, after extensive discovery and many depositions, the court, in a March 28, 2001 Order, granted Coca-Cola's motion for summary judgment on all counts of the complaint. As for the misappropriation of trade secrets claim, the court found as a matter of law that although Magic Windows was a trade secret, Coca-Cola had not misappropriated either the concept or the actual printing process of Magic Windows. The court also held that Coca-Cola had not breached the *Non-Disclosure Agreement*, finding as a matter of law that the Magic Windows concept was rightfully received from BrightHouse, and that ITW independently developed the labels from "simple, everyday printing" techniques. Finally, the court held that the remaining counts – conversion, breach of

confidential relationship and duty of good faith, unjust enrichment, and quantum meruit – were superseded by Georgia's trade secret law. As a result of the court's rulings, judgment was entered for Coca-Cola and the case was closed.

PKM appeals each of the district court's rulings, contending that (1) there are genuine issues of material fact as to whether Coca-Cola misappropriated confidential information regarding Magic Windows and breached the *Non-Disclosure Agreement,* and (2) the district court improperly applied Georgia trade secret law regarding both misappropriation and supersession. For these reasons, PKM maintains the district court's judgment should be reversed.

Since the heart of this case involves the claim for the misappropriation of trade secrets, we begin our analysis of the district court's rulings on that issue.[5]

## II.

### A.

Under the Georgia Trade Secrets Act ("GTSA"), O.C.G.A. § 10-1-760 et seq., a claim for misappropriation of trade secrets requires a plaintiff to prove that

---

[5] When examining summary judgments, our review is plenary. See, e.g., Georgia-Pacific Corp. v. Lieberam, 959 F.2d 901, 904 (11th Cir. 1993). We will affirm a grant of summary judgment only if no genuine issue of material fact exists and only if the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The same legal standards that controlled the district court apply here. In this case Georgia law provides the rule of decision.

13

"(1) it had a trade secret and (2) the opposing party misappropriated the trade secret." Capital Asset Research Corp. v. Finnegan, 160 F.3d 683, 685 (11th Cir. 1998) (quoting Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp., 139 F.3d 1396, 1410 (11th Cir. 1998)).  Whether information constitutes a "trade secret" is a question of fact. Camp Creek, 139 F.3d at 1410-11 (citing Wilson v. Barton & Ludwig, Inc., 296 S.E.2d 74, 78 (Ga. Ct. App. 1982)).

The Act defines "trade secret" as

> information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information:
> (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> (B) Is the subject of efforts that are reasonable under the

circumstances to maintain its secrecy.

O.C.G.A. § 10-1-761(4). "The fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements." Essex Group, Inc. v. Southwire Co., 501 S.E.2d 501, 503 (Ga. 1998) (quoting Restatement (Third) of Unfair Competition § 39(f) (1995)). Hence, even if all of the information is publicly available, a unique combination of that information, which adds value to the information, also may qualify as a trade secret. Finnegan, 160 F.3d at 686 (citing Essex Group, 501 S.E.2d at 503).

The district court found that although many elements of PKM's Magic Windows were included in the Virtual Image patent application, including the concept of using a coded message on the reverse side of a label requiring that the bottle be emptied so that the coded message can be decoded through a transparent window, many aspects of Magic Windows were unique. For instance, PKM's label was non-embossed and utilized ink, while the decoding label detailed in the Virtual Image application was embossed and did not bear ink. Additionally, PKM was able to provide complete image security before the bottle was at least partially emptied, whereas the Virtual Image application indicated that previous colored

filter decoding methods only provided limited image security. Finally, nothing in the Virtual Image patent application dealt with the production elements used to produce PKM's Magic Windows labels. With these unique aspects in mind, the district court ruled that PKM had in Magic Windows "accomplished an effective, successful and valuable integration of the public domain elements," Essex Group, 501 S.E.2d at 503, and therefore, possessed a trade secret.

Our review of the record supports the findings of the district court. Each of the required statutory elements is satisfied. First, as indicated above, certain aspects of Magic Windows were not "commonly known by or available to the public." In particular, the production process was unique to PKM and unknown to its competitors. See Salsbury Labs., Inc. v. Merieux Labs., Inc., 908 F.2d 706, 710-11 (11th Cir. 1990). Second, it is clear that PKM's information possessed actual or potential economic value; after all, both Coca-Cola and Pepsi International were negotiating with PKM for a potential licensing agreement at the time of the purported misappropriation. Third, Glancy's oral insistence on confidentiality at the initial November 5, 1995 meeting (and in its meetings with Pepsi International), as well as the written *Non-Disclosure Agreement* with Coca-Cola, were certainly reasonable efforts to maintain the secrecy of Magic Windows. We find no legal error in the district court's judgment that PKM's Magic Windows

16

constituted a trade secret under Georgia law.

Before proceeding, however, we highlight the fact that most of PKM's concept elements were covered by the prior art outlined in the Virtual Image patent application, and therefore are not protectable as trade secrets. O.C.G.A. § 10-1-761(4).

B.

Having agreed with the district court that information regarding Magic Windows constitutes a trade secret, we must next determine whether Coca-Cola misappropriated PKM's trade secrets when it had ITW develop a label.[6]  A defendant misappropriates a trade secret when, among other things, it discloses or uses a trade secret of another, without express or implied consent, knowing that at the time of disclosure or use the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. O.C.G.A. § 10-1-761(2)(B);[7] see Kuehn v. Selton & Assocs., 530 S.E.2d 787, 791 (Ga. Ct. App.

---

[6] Whether Coca-Cola used PKM's trade secret is a question of fact. See Outside Carpets, Inc. v. Indus. Rug Co., 185 S.E.2d 65, 68 (Ga. 1971).

[7] O.C.G.A. § 10-1-761(2)(B) provides, in pertinent part:
    "Misappropriation" means:
      (B) Disclosure or use of a trade secret of another without express    or implied consent by a person who:
            (i) Used improper means to acquire knowledge of a trade
            secret; [or]

17

2000).  In this case, the surrounding circumstances, namely the *Non-Disclosure Agreement*, clearly gave rise to a duty on the part of Coca-Cola to maintain the secrecy of any Magic Windows trade secrets.  In fact, Coca-Cola does not dispute that it had a duty to maintain the secrecy of PKM's shared trade secrets.  The issue of misappropriation, therefore, hinges on whether Coca-Cola actually disclosed or used PKM's trade secrets when it employed ITW to develop a label – an allegation Coca-Cola vigorously denies.

When the Supreme Court of Georgia recently addressed trade secrets under the GTSA, it relied heavily upon the Restatement (Third) of Unfair Competition (1995) – quoting and adopting two paragraphs from the Restatement to determine the meaning of "trade secret."  See Essex Group, 501 S.E.2d at 503.  We therefore think it prudent to consult the Restatement for guidance to determine what constitutes "disclosure" and "use" under the Act.  Section 40 provides the answer:

> There are no technical limitations on the nature of the
>
> conduct that constitutes "use" of a trade secret . . . .  As a

---

(ii) At the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:
>   (I)  Derived from or through a person who had
>   utilized improper means to acquire it; [or]
>   (II) Acquired under circumstances giving rise to a
>   duty to maintain its secrecy or limit its use.

18

general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use" . . . . Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, [and] relying on the trade secret to assist or accelerate research or development . . . all constitute "use."

The unauthorized use need not extend to every aspect or feature of the trade secret; use of any <u>substantial portion</u> of the secret is sufficient to subject the actor to liability. Similarly, the actor need not use the trade secret in its original form. Thus, an actor is liable for using the trade secret with independently created improvements or modifications if the result is <u>substantially derived</u> from the trade secret. . . . However, if the contribution made by the trade secret is <u>so slight</u> that the actor's product or process can be said to derive from other sources of information or from independent creation, the trade secret has not been "used" for purposes of imposing liability

under the rules . . . .

The owner of a trade secret may be injured by unauthorized disclosure of a trade secret as well as by unauthorized use. . . . Any conduct by the actor that enables another to learn the trade secret . . . is "disclosure" of the secret.

Restatement (Third) of Unfair Competition § 40 cmt. c (1995) (emphasis added).

To summarize, under the Restatement, a defendant is liable for the misappropriation of a trade secret only if the plaintiff can show that the defendant (1) disclosed information that enabled a third party to learn the trade secret or (2) used a "substantial portion" of the plaintiff's trade secret to create an improvement or modification that is "substantially derived" from the plaintiff's trade secret. On the other hand, if the defendant independently created the allegedly misappropriated item with only "slight" contribution from the plaintiff's trade secret, then the defendant is not liable for misappropriation. These standards suggest that for Coca-Cola to be liable for misappropriating Magic Windows, PKM must prove either that Coca-Cola disclosed information that enabled ITW to learn PKM's trade secret or that ITW's label was "substantially derived" from PKM's

Magic Window label and not the result of independent creation.[8]  We think that

PKM has failed to prove either.


1.

PKM has presented no direct evidence that Coca-Cola disclosed PKM's

trade secrets to ITW.  Several Coca-Cola representatives testified that no PKM

trade secrets were revealed to ITW.  Moreover, employees from ITW, Steve

Everett and Jeffrey Albaugh, both testified that ITW alone determined how to

develop its bottle label and that they did not utilize any information from Coca-

Cola or PKM in the production process.

Faced with a lack of direct evidence that Coca-Cola disclosed PKM's trade

secrets, PKM resorts to relying on various forms of circumstantial evidence to

prove Coca-Cola actually disclosed its trade secrets to ITW.  First, PKM highlights

---

[8] Courts applying Georgia's pre-GTSA trade secret law also indicate that the correct test for determining if a defendant has made unauthorized use of a trade secret is to figure out if the defendant's product is "substantially derived" from the plaintiff's product.  See Salsbury Labs., Inc. v. Merieux Labs., Inc., 908 F.2d 706 (11th Cir. 1990) (determining if the defendant's process "closely resembles" plaintiff's process and finding that defendant's process was "substantially derived" from plaintiff's process); Speciality Chems. & Servs. v. Chandler, 1988 WL 618583 at *5 (N.D. Ga. 1988) (stating that "even with independent improvements or modifications, a party cannot use another's trade secrets so long as their product is *substantially derived* from the trade secrets) (emphasis in original); see also Outside Carpets, Inc. v. Indus. Rug Co., 185 S.E.2d 65, 68 (Ga. 1971) (determining that defendant's product "utilize[d] the same principles" as plaintiff's product).  Although the GTSA superceded Georgia law on trade secrets, O.C.G.A. § 10-1-767(a), "prior law consistent with the Act remains viable precedent." Essex, 501 S.E.2d at 503 (citing Avent, Inc. v. Wyle Labs., Inc., 437 S.E.2d 302 (Ga. 1993)).

21

the fact that Coca-Cola cannot produce as evidence the label it provided to ITW, and argues Coca-Cola's inability to do so warrants a "negative inference" of misappropriation. We find no support in the law for such a proposition. In this circuit "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir. 1997). There is no indication of bad faith in this case, so we decline to draw an adverse inference for the lost label.

Second, PKM points out that the "same [Coca-Cola] employees who received PKM's disclosures approached ITW to produce the Argentine label." It again suggests this fact warrants an inference of misappropriation. For the same reason, we decline to draw such an inference. Additionally, we note that it was the job of these Coca-Cola representatives to develop product and marketing promotions. This inevitably requires meeting with more than one entity.

Finally, PKM argues that notes written by Steve Everett, testimony by Jeffrey Albaugh, and a voice mail message left by a Coca-Cola representative who had met with both PKM and ITW all prove that Coca-Cola provided ITW with PKM's disclosed label and other trade secret information. We disagree. The testimony of Everett, Albaugh, and the Coke representative indicate that the label provided to ITW had red litho paper and was not of professional quality (as was

22

PKM's).  Additionally, that same testimony, especially Albaugh's, reveals that Coca-Cola did not disclose any information to ITW that belonged to PKM.  The limited instructions given by Coca-Cola to ITW involved matters unrelated to elements that PKM claim as trade secrets.

In sum, we find that PKM has failed to provide evidence that Coca-Cola actually disclosed its trade secrets to ITW.

## 2.

We must next determine whether PKM has provided evidence that Coca-Cola and/or ITW actually used any Magic Windows trade secrets.  To show unauthorized use, PKM must prove that the label developed by ITW was "substantially derived" from the Magic Windows label and not the product of independent development.  Our inquiry requires us to compare and contrast the various elements of the two labels.  For sake of analytical convenience we will discuss the Magic Windows elements along the two categories proposed by Coca-Cola's expert: concept and production.

## a.

We begin with the five identified production processes, which the parties

refer to as (1) printing press, (2) inks, (3) film material, (4) color sequencing, and (5) reverse printing:

Printing press

Magic Windows is printed on a gravure or comparable press. The evidence indicates that the ITW labels were created on flexographic presses.

Inks

Magic Windows is made with standard inks. The evidence provides that Albaugh, with the help of Sun Chemical, decided which inks to use and chose proprietary inks.

Film Material

Magic Windows is printed on a single-laminate, flexible plastic packaging material. The evidence shows that Albaugh alone decided which film to use as a substrate for the label and that he chose a single-ply film that was not laminated.

Color Sequencing

Magic windows uses a label production process and color sequences whereby up to eight colors can be utilized. The evidence indicates that Albaugh alone decided the label production process, including determining the numbers of colors to use and the color sequences. He chose both a

24

different number of colors from Magic Windows (seven instead of eight) and used a different sequence than that used in Magic Windows.

Reverse printing

Magic Windows is printed on a film, as a substrate, or reverse-printed, which leaves the plastic film facing forward and toward the viewer. The evidence provides that Albaugh was responsible for determining whether to print on the surface or to reverse print on the label, and that he used forward printing.

The above comparisons show that none of the five production elements in ITW's label match those for Magic Windows. Moreover, the evidence also indicates that ITW employee Albaugh alone decided the various production processes. Accordingly, the conclusion is inevitable that the production processes of the ITW label were not derived, much less "substantially derived," from PKM's Magic Windows label.

b.

Having determined that Coca-Cola did not use PKM's production elements, we next consider whether Coca-Cola used PKM's Magic Windows concepts. A cursory analysis of the two labels indicates that the two labels share nearly

25

identical concepts. On the surface it thus appears that Coca-Cola and ITW may have used PKM's concepts. Coca-Cola contends, however, that all of the concept elements listed in PKM's trade secret were presented to Coca-Cola by BrightHouse in late 1995, and as the lawful owner of the concepts presented by BrightHouse, Coca-Cola independently developed all of the concepts revealed by PKM's trade secret. Moreover, most of PKM's concepts were already part of the public domain, as revealed by the Virtual Image patent application. Coca-Cola argues, therefore, that any concept used to assist ITW with the making of labels belonged to or was legitimately used by Coca-Cola, and that no PKM's trade secret concept elements were used to make the ITW label. To assess Coca-Cola's argument, we compare the PKM concept elements with the concepts presented by BrightHouse.

As mentioned above, BrightHouse presented the idea of a bottle label with a scrambled message on the back side of the label and a red decoder filter – called the "Red Zone" – printed on the front of the label. BrightHouse's Chief Operating Officer, Roger Milks described the concept as follows:

> [T]he concept being that the bottle is – as the liquid is
>
> consumed and the level drops in the bottle, you could
>
> look through the Red Zone and you would see something
>
> on the opposite side of the bottle on the inside of the

26

label, the purpose of that red device being to decode the message.

. . .

If you weren't viewing it through the red [filter], all you would see is a blurred, illegible message. If you look at it through the Red Zone – i.e., the prize is in the Red Zone – you would decode the message and you would either be an instant winner or not.

The color graphic shown to Coca-Cola by BrightHouse at the presentation stated: "Purchasers of 20oz bottle would look through the Coca-Cola Red Zone circle to reveal instant win prizes. The Red Zone is a clear plastic circle that allows consumer to look through the bottle, once the product is gone, to see [the] prize revealed on the inside of the label." The graphic also contained a label design with a "Red Zone" transparency that revealed a "You Win" message on the inside of the opposite side. The inside message contained three colors: red, white and black.

PKM has presented no evidence refuting this testimony. We find, as did the district court, that the BrightHouse presentation revealed all of PKM's concepts. Like PKM's Magic Windows, BrightHouse's idea is a (1) promotional concept (2)

that requires purchasers of containers to empty the contents of a container (3) to determine if they have won a prize (4) from a commercially feasible beverage label (5) with a non-embossed (6) two or three colored (7) encrypted message (8) on the inside or reverse side of the label (9) that is visually incoherent (10) and located approximately 180° (11) from a colored window filter (12) used to view and decode the message (13) in a visually coherent form. Additionally, we agree with Coca-Cola that even if the BrightHouse concepts were not revealed to Coca-Cola, most of the concept elements at issue were part of the public domain and were not protectable as trade secrets.

PKM nonetheless argues that it is irrelevant whether the BrightHouse proposal is similar to the "concept" of PKM's Magic Windows because Coca-Cola relied on PKM's sample labels and not the BrightHouse drawing when it asked ITW to develop the labels. PKM contends that Coca-Cola's inability to demonstrate that it utilized the BrightHouse idea instead of the PKM concept when seeking ITW's assistance is "fatal to Coke's defense because it cannot prove that its alleged independent development was done 'in the absence of any misappropriation.'" We think, however, that PKM is improperly attempting to shift the burden of proof to the defendant; PKM, as the plaintiff, maintains the burden of proving misappropriation. See Capital Asset Research Corp. v.

28

Finnegan, 160 F.3d 683, 685 (11th Cir. 1998).  PKM has simply not provided evidence to support its claim that Coca-Cola used the concepts from PKM.

In short, PKM has failed to demonstrate a fact issue as to whether the label developed by Coca-Cola via ITW was "substantially derived" from any PKM trade secrets.

### III.

In part II we held that the district court correctly determined that PKM's Magic Windows label was a trade secret within the meaning of the Georgia Trade Secrets Act (GTSA).  As a consequence of that ruling, we now must decide whether the district court rightly concluded that four of PKM's remaining claims – conversion, breach of confidential relationship and duty of good faith, unjust enrichment, and quantum meruit – must be dismissed because they are superseded by the Act.

Section 10-1-767(a) provides that the GTSA "supersede[s] conflicting tort, restitutionary, and other laws of [Georgia] providing civil remedies for misappropriation of a trade secret."  Subpart (b) of that section goes on to state, however, that the statute does not affect (1) "contractual duties or remedies,

29

whether or not based upon misappropriation of a trade secret"[9] or (2) "other civil remedies that are not based upon misappropriation of a trade secret."  PKM contends that each of the above four claims falls under the second exception, and therefore they are not superseded by the GTSA.  Coca-Cola, on the other hand, argues that the GTSA explicitly supersedes each of the four claims.

Specifically, PKM argues that since claims of conversion, breach of confidential relationship and duty of good faith, unjust enrichment, and quantum meruit "are not dependent on the existence of a trade secret," each claim is not "based" upon the misappropriation of a trade secret, and therefore not preempted. Stated another way, PKM argues that conversion, breach of confidential relationship and duty of good faith, unjust enrichment, and quantum meruit are each distinct theories of civil remedies for the wrongful use of information not rising to the level of a trade secret,[10] and thus do not "conflict" with a

---

[9] PKM's Count III, Breach of Contract, clearly falls within this exception.  The district court, accordingly, was correct to determine that this count was not superceded by the GTSA. We address PKM's breach of contract claim, infra part IV.

[10] Some cases distinguish between trade secret information and confidential information, see, e.g., Jensen Tools, Inc. v. Contact East, Inc., 1992 WL 245693 (D. Mass. 1992), and hold that a claim (such as a breach of fiduciary duty) involving underlying information that does not qualify as a trade secret is not preempted. See, e.g., Combined Metals of Chicago, Ltd. v. Airtek, Inc., 985 F. Supp. 827, 830 (N.D. Ill. 1997); see also Frantz v. Johnson, 999 P.2d 351, 358 n.3 (Nev. 2000) ("There may be future instances where a plaintiff will be able to assert tort claims . . . that do not depend on the information at issue being deemed a trade secret, and are therefore barred by the UTSA").

30

misappropriation of a trade secret claim.[11]  Although PKM's statements may be true under certain circumstances, we fail to recognize how they support its case here, given that the allegedly misused information actually does rise to the level of a trade secret.

In the lone Georgia appellate opinion to signficantly address supersession under the GTSA, the court of appeals held that a claim of conversion is superseded by the GTSA "to the extent" the claim addresses a trade secret. Tronitec, Inc. v. Shealy, 547 S.E.2d 749, 755 (Ga. Ct. App. 2001).[12]  Unlike the facts in Tronitec, which involved an allegation for the conversion of trade secret information and personal property, PKM's claims are wholly based upon a trade secret.  Indeed, the *full* extent of each of PKM's claims, be it conversion, breach of confidential

---

[11] The GTSA only preempts common law claims that "conflict" with its provisions. O.C.G.A. 10-1-767(a).  Unfortunately, Georgia courts have not specifically defined what constitutes a conflict between the GTSA and the common law.  Some non-Georgia courts, when addressing a particular state's version of the UTSA, have indicated that blanket preemption applies to all claims involving information that the plaintiff claims is a trade secret, see Hutchinson v. KFC Corp., 809 F. Supp. 68, 71 (D. Nev. 1992), while other courts have held that claims are only preempted to the extent that they contain the same factual allegations as the claim for use or misappropriation of trade secrets. See Micro Display Sys., Inc. v. Axtel, Inc., 699 F. Supp. 202, 204-05 (D. Minn. 1988).  The lone Georgia case to address the issue appears to have sided with the latter group.  It held that a claim for conversion was preempted by the GTSA only to the extent it involved a trade secret. Tronitec, Inc. v. Shealy, 547 S.E.2d 749, 755 (Ga. Ct. App. 2001).

[12] Tronitec involved an allegation for the conversion of trade secret information *and* personal property.  The appellate court held that personal property (a personal computer) is not a trade secret, and thus the claim for conversion, to the extent based on the personal property, was not based on a trade secret.

31

relationship and duty of good faith, unjust enrichment, quantum meruit, misappropriation of a trade secret, or breach of contract, is based upon a trade secret.[13]  So, even if PKM is correct that information outside the scope of a trade secret is not preempted under Georgia law, PKM's four claims at issue are clearly "based" upon a trade secret, and thus are superceded by the GTSA. See Powell Products, Inc. v. Marks, 948 F. Supp. 1469, 1474 (D. Colo. 1996) (citing Roger M. Milgrim, Milgrim on Trade Secrets, § 1.01[4], at 1-68.14 (1996)) (Preemption is appropriate where "other claims are no more than a restatement of the same operative facts which would plainly and exclusively spell out only trade secret misappropriation").[14]

---

[13] The complaint makes this fact abundantly clear.  Every count asserts the same exact basis for relief: "Coke utilized confidential information from Penalty Kick relating to the Magic Windows Label Technology in Coke's La Ventana Magica promotion." (The only difference is that Count 1 (conversion) says "used" instead of "utilized.")  Given that PKM at all times argues that Magic Windows is a trade secret and does not at any point in this case distinguish confidential information from trade secret information, the only inference is that PKM was referring to the same confidential information in each of its claims.  In other words, PKM's claims are all based on the same facts that comprise the trade secret misappropriation claim.

[14] See also the Restatement (Third) of Unfair Competition 3d § 40 cmt. a (1995), which provides:

> The rules stated in this Section [addressing the appropriation of trade secrets] are applicable to common law actions in tort or restitution for the appropriation of another's trade secret, however denominated, including actions for "misappropriation," "infringement," or "conversion" of a trade secret, actions for "unjust enrichment" based upon the unauthorized use of a trade secret, and actions for "breach of confidence" in which the subject matter of the confidence is a trade secret.

32

We therefore agree with the district court's holding that PKM's claims for conversion, breach of a confidential relationship and duty of good faith, unjust enrichment, and quantum meruit are superseded by the GTSA.

IV.

We have yet to address PKM's remaining count – the claim for breach of contract.[15] PKM complains that Coca-Cola violated the *Non-Disclosure Agreement* by disclosing confidential information to ITW which then used the information to make the Magic Windows labels. Coca-Cola responds by arguing that the agreement explicitly negated its obligation of confidence upon the occurrence of certain events. Specifically, Coca-Cola agrees with the ruling of the district court: Coca-Cola did not breach the *Non-Disclosure Agreement* because, pursuant to the Agreement's provision allowing it to disclose information that "at the time of disclosure, is available to the public" or "is rightfully received from a third party," Coca-Cola rightfully received the Magic Windows concept from BrightHouse and used bottle labels independently developed by ITW. The record clearly supports the district court's ruling.

As we mentioned above, in February of 1996, the parties executed a *Non-*

---

[15] As we note *supra* note 9, Coca-Cola's contractual obligations are separate and independent from those imposed under the GTSA. O.C.G.A. § 10-1-767(b)(1).

33

*Disclosure Agreement* in which each party agreed not to disclose to any third party confidential information shared during discussions regarding Magic Windows. The agreement, however, also stipulated that there was "no obligation to maintain in confidence any information" that (1) "at the time of disclosure is available to the public"; (2) "is rightfully received from a third party"; or (3) Coca-Cola could "establish was subsequently developed independently by [Coca-Cola or its subsidiaries or affiliates] independently of any disclosure" by PKM. The record is clear that Coca-Cola meets these three stipulations. The evidence indicates that ITW independently developed its label without any disclosure of PKM's trade secrets. The evidence also indicates that most of the concepts PKM claims as a trade secret were available to the public at the time of its negotiations with Coca-Cola, and even if they were not available, Coca-Cola rightfully received all of PKM's concepts from BrightHouse. Consequently, PKM fails to provide evidence that Coca-Cola breached the *Non-Disclosure Agreement*.

## V.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

SO ORDERED.